United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID L. HILL,

Petitioner,

v.

T. VIRGA, Warden,

Respondent.

_________________________________/

No. C 11-4793 YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; GRANTING, IN PART, CERTIFICATE OF APPEALABILITY**

## INTRODUCTION

This matter is now before the Court for consideration of Petitioner David L. Hill's *pro se* Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 concerning his 2007 conviction in Santa Clara County Superior Court. For the reasons set forth below, the Petition is DENIED as to all claims. A certificate of appealability is granted, in part.

## BACKGROUND

### I. Case History

On January 4, 2007, a San Francisco County jury convicted Petitioner of second degree murder with a peace officer special circumstance and firearm enhancements, attempted first degree murder, assault on a peace officer with personal use of an assault weapon, and possession of an assault weapon with a gang allegation. Clerk's Transcript (CT) at 1778-86; Reporter's Transcript (RT) at 10691-94. On April 20, 2007, Petitioner was sentenced to life in prison without the possibility of parole (LWOP) on the second degree murder conviction, plus a consecutive sentence of life in prison on the attempted murder conviction. The court also sentenced Petitioner to a two-year term on the conviction of possession of an assault rifle plus a consecutive three-year term on the gang enhancement.

The court stayed the sentences on the other convictions. CT at 1847-52; RT at 10734-36.

Petitioner appealed his convictions to the California Court of Appeal. Ex. C. On January 13, 2011, the California Court of Appeal, in an opinion certified for partial publication, affirmed the judgment of conviction. Ex. F, *People v. Hill*, A 117787; 191 Cal. App. 4th 1104 (2011). The Court of Appeal also denied a separate Petition for Writ of Habeas Corpus that Petitioner had filed. Exs. E, G. Petitioner subsequently filed a petition for review in the California Supreme Court, seeking review of the Court of Appeal's rejection of his direct review claims and his habeas petition. Exs. H, I. On April 20, 2011, the California Supreme Court denied both petitions for review. Exs. J, K.

On September 27, 2011, Petitioner filed the instant Petition. On October 24, 2011, the Court issued an Order to Show Cause in which it found all claims cognizable with the exception of an Eighth Amendment claim based on cruel and unusual punishment and an Eighth Amendment claim based on admission of gang expert testimony. A due process claim based on the trial court's admission of rebuttal evidence was dismissed for failure to specify the grounds for relief, but Petitioner complied with the Court's order and filed an amendment to his petition stating the facts supporting this claim. Respondent filed an Answer to the Petition, and Petitioner has filed a Traverse. The case is now ready for review on the merits.

## II. Facts

The California Court of Appeal set forth the following factual summary.

### The Prosecution's Case

> Around 9:00 p.m. on April 10, 2004, Parker and Espinoza patrolled the Bayview District (the Bayview) in an unmarked gray Crown Victoria patrol car, dressed in civilian clothes. Parker drove and Espinoza sat in the front passenger seat. As Parker turned from Third Street onto Newcomb Avenue, he heard someone say, "woo woo," usually a signal to people on the street that police are present. Parker continued driving down Newcomb toward Newhall Street and observed two men walking toward the corner of Newcomb and Newhall. As Parker drove closer, the two men appeared startled, stopped walking and looked in the officers' direction. One of the men, appellant, then turned right and walked southbound on Newhall, looking over his shoulder at the officers. Appellant wore a dark, three-quarter length pea coat. The other man continued walking straight ahead.
>
> As the officers turned onto Newhall from Newcomb and drove "at a crawl," appellant stopped, backed up against a van and appeared to shrug his shoulders or take a deep breath. Seconds later, appellant continued walking on Newhall. The

officers followed appellant until they were parallel with and approximately 16 feet from his position on the sidewalk. From inside the patrol car, Espinoza shined his flashlight on appellant's face; appellant immediately turned and looked directly toward the patrol car. Appellant then turned away and continued walking on the sidewalk down Newhall. Appellant's left arm swung in a natural walking motion, but not his right arm. Parker told Espinoza appellant was trying to conceal something from them and suggested the officers stop and talk to him.

Parker and Espinoza exited the patrol car. Parker's police star was outside his shirt. Parker stood between the open driver's door and the driver's seat while Espinoza approached appellant, who was walking on the sidewalk. Espinoza again flashed his flashlight on appellant and said, "Hey, let me talk to you." Appellant was about 10 to 12 feet in front of Espinoza. Appellant twice said, "I don't have any I.D." and looked over his shoulder at Espinoza. Espinoza did not take his gun out. Appellant started walking fast, and Espinoza twice said to him, "Stop, police."

Parker then entered the patrol car and drove about 10 feet further up the street. Appellant continued walking, with Espinoza following him on foot at a distance of five to seven feet. Appellant stopped and turned to face Espinoza. Parker saw the magazine of an assault rifle, and appellant fired two shots. Espinoza fell to the ground.

Parker exited the patrol car, knelt down between the front driver's door and driver's seat and took out his gun. Parker heard more shots fired in his direction; the patrol car's windshield exploded. Parker moved behind the trunk of the patrol car as he continued to receive gunfire. He then ran across the street seeking "good cover" on the sidewalk on the east side of Newhall. Parker never had a chance to fire a shot. At some point the shooting stopped and Parker radioed an "officer down" message.

The "upset, scared," Parker went to Espinoza, who was lying on the sidewalk, with his fully loaded gun inside its fastened holster. Espinoza was transported to the hospital, where he died from loss of blood from gunshot wounds to his thigh and abdomen. Parker was treated at the hospital for bullet fragments in his ankle. At 1:00 a.m., about three hours after the shooting, while at the emergency room, Parker was shown a photo lineup and identified a picture of Reuben Sibley as Espinoza's killer. Parker signed and wrote his star number on Sibley's photo.

Police recovered 12 shell casings at the shooting scene on Newhall between the unmarked patrol car and the street. An AK-style semi-automatic assault rifle with an attached magazine was found nearby at 1790 Oakdale Avenue. Eleven of the 12 shell casings were later determined to have been fired from this weapon. Each bullet fired required a separate trigger pull. A crime scene investigator opined that, based on the trajectory of the shots fired, some shots were fired from the sidewalk, while others were fired after the shooter moved from the sidewalk into the street.

At 1835 Palou Street, police found a pea coat and gloves which residents had seen someone discard. Appellant's California identification card and a small plastic bag containing suspected marijuana were found inside the pea coat.

Between 11:00 and 11:45 p.m. on the night of the shooting, appellant went to the San Francisco home of his grandmother, Annie Lee Clark, and told her he thought he had shot someone. Appellant seemed "nervous and upset."

The next morning, at 11:30 a.m., uniformed San Ramon police officers were dispatched to the San Ramon Regional Medical Center (medical center) in response

to a report that a large male in the emergency room was acting "very strange" and paranoid and the staff feared he might become violent. En route, police learned there was a murder suspect in the emergency room. The police arrived with guns drawn and found appellant holding two plastic flowers. Appellant complied with police orders to lie prone on the floor and was handcuffed. . . .

. . .

After the medical center cleared appellant for release, he was transported by ambulance to the San Francisco jail. A blood test conducted on him at approximately 4:00 p.m. on April 11, 2004, reflected the inactive metabolite of marijuana. The blood test results indicated that there was no active, psychoactive compound present in appellant's blood, but that at some point he had consumed marijuana, possibly at 4:00 a.m. or 6:00 a.m.

**Gang Expert Testimony**

[San Francisco Police Inspector Toney] Chaplin testified as an expert on gang members, specifically those from African-American gangs in the Bayview/Hunters Point areas of San Francisco. Chaplin said West Mob is a criminal street gang that has continually existed since before 2000. He identified West Mob's geographic "territory," an area between West Point and Middle Point. West Mob members commit rape, homicide, assault with firearms, narcotic sales, car theft, burglary, and robbery. These crimes enhance the gang's reputation and benefit it monetarily. West Mob operates with "situational leadership" and its members, who are predominantly African-American, share guns, cars and the proceeds of their crimes. Between 2000 and 2004, West Mob had gang alliances with Oakdale Mob and Sunnydale.

Chaplin stated that Big Block is a criminal street gang in the Bayview that has existed continuously since before 2000. He described its geographical "turf" as Northridge Road between Harbor and Jerrold Avenue on one side and Kiska Road on the back, including Milton Meyer Recreational Center. Between 2000 and mid-2004 Big Block had gang alliances with BNT ("Broke Niggas Thieven")/Kirkwood Mob and Get Paid. Chaplin said Big Block's leader, Douglas Stepney, admitted a rivalry existed between Big Block and West Mob that began at the end of 1999 and existed actively in April 2004. Gang members cannot move freely throughout the Bayview; if they leave their respective areas, they "fear" being shot or killed. In April 2004, Big Block and West Mob members could not safely sell drugs on each other's turf. As a result of this rivalry, between 2000 and the first half of 2004, there were hundreds of shootings in the area. Chaplin testified that retaliation is a part of gang culture; it instills a sense of pride in the gang. When asked about how gang killings are done, Chaplin said, "[s]ome of them are crimes[s] of opportunit[y], some of them are orchestrated events, some of them are orchestrated to get one individual and you end up getting another one. . . . So if the guy you're looking for is not there, . . . you're not just going to turn around and run out. You're going to do what you have to do at that point."

Chaplin said that gang members harbor hostile attitudes toward the police. "Retaliation against a [rival] gang member sends a message to other gang members, but the murder of a police officer sends a message to the community, 'Hey, even your protectors can be touched.'"

Chaplin testified that, in April 2004, a West Mob member could safely purchase marijuana anywhere in the Bayview except for Newcomb and Newhall. Newcomb

and Newhall was an area one "would not ever expect to see somebody from West Mob . . . for any reason other than a gang reason, a shooting or a killing."

Chaplin explained 11 criteria formulated by the San Francisco District Attorney's Office and the San Francisco Police Department to determine whether a person is a member of a Bayview African-American gang. Chaplin said a person must meet two or more of those criteria to be listed as a gang member. Based on specific incidents occurring between March 1998 and December 2003, Chaplin opined that appellant was an active participant in West Mob for at least five years prior to April 2004.

Chaplin said that gang members refer to an unmarked police car as a "ghost," such as "white ghost" or "gray ghost." An audiotape of a conversation between appellant and Deangelo Redd at the San Francisco jail on June 20, 2004, was played for the jury. Chaplin said that appellant's reference in the tape to "white ghost" means an unmarked police car.

Chaplin said Ronnie "Uda" Allen, deceased at the time of the trial, was a central figure in the Big Block gang from 2003 through April 2004. Chaplin frequently saw him in Big Block's home turf and BNT's home turf and the "1700 block area" of the Bayview, described as Newcomb and Newhall. On May 3, 2004, Chaplin talked to Allen outside Allen's home at 1662 Newcomb. Chaplin asked Allen why West Mob was "out to get him," and Allen responded, "Because of some shit they think I did. . . . That shit that happened to Espinoza was meant for me." Chaplin said Allen's "extremely active" role in Big Block up to April 2004 made him a target for West Mob retaliation.

Chaplin testified appellant knew Allen because Allen's gang name, Uda, came up in a recorded jailhouse conversation between appellant and another jail inmate on May 30, 2004. Chaplin opined that appellant's actions on the night of the April 10 shooting were consistent with a West Mob member retaliating against a Big Block member based on the following hypothetical facts: (1) appellant's brother, James Hill, was shot in the Bayview in April 2000; (2) West Mob member Deandre Dow was murdered in a drive-by shooting at West Point and Middle Point in February 2004; (3) Allen murdered Dow; (4) Allen was a member of Big Block; (5) Allen was staying at 1662 Newcomb in April 2004; (6) appellant had been a West Mob member for four or five years before April 2004; (7) at approximately 9:30 p.m. on April 20, 2004, appellant was walking with another African-American male on the 1700 block of Newcomb and appellant had a loaded assault rifle hidden under his pea coat; and (8) appellant walked to about 200 feet from 1662 Newcomb. Armed with a loaded assault rifle, appellant "was walking up to . . . arguably the most dangerous of all rivals of his group."

**The Defense**

On the evening of April 10, 2004, Louis Telfor testified he was on Newcomb and Newhall selling drugs when he saw appellant talking to Telfor's friend, "Niles." Niles told Telfor he was going to sell appellant some marijuana. On numerous prior occasions, Telfor had seen appellant purchase marijuana at Newhall and Newcomb. As Telfor headed for home, he saw a police Crown Victoria and Espinoza said to him, "Hey Louie." Telfor wanted to avoid the police so he began walking toward McKinnon Avenue to his mother's house. Five or seven minutes later he heard gunfire. Telfor said the unmarked Crown Victorias he sees in the Bayview are either undercover police cars or are driven by people he does not know. According to Telfor, in 2004 it was safer to buy drugs on Newcomb than on

United States District Court
For the Northern District of California

Third Street.

Freelance writer Charles Jones lived in the Bayview for most of his life, until late 2003 or early 2004. He opined that at 9:30 p.m. in April 2004 it would be safer for anyone from the Bayview, including a gang member, to walk on Newhall and Newcomb than to walk on Third Street because Newhall and Newcomb is less populated and darker. Similarly, during that time period it would also be safer to buy marijuana on Newhall than at Third and Newcomb.

Neurophysiologist Scott Fraser testified on the effects of high stress on human functioning, particularly perception and memory. He opined that a hypothetical police officer's statement, taken 48 hours after an extremely traumatic event, that his police star was underneath his shirt (or he could not remember the star's location) was more reliable than the same officer's trial testimony two-and-a-half years later that this star was outside his shirt. Fraser also opined that waiting 48 hours to interview a police officer whose partner died in a shooting results in the officer's memory being less accurate than it would have been had he been interviewed much closer to the time of the shooting.

Fraser also testified that a person under the influence of marijuana will have "less acuity in terms of processing information, . . . discerning intentions, assessing consequences . . . ." He said that under the influence of marijuana a person tends to get distracted, has a short attention span, does not process information as carefully, and takes longer to make decisions. He opined that hypothetically, when a person is under the influence of marijuana and is in a high stress situation where they feel their life is threatened, the person is more prone to "automatic fight or flight responses. If [the person has] the resources to fight, the research indicates the person would probably engage in counterattack. If [the person] would have the . . . capability for flight but not the resources to attack, [the person will] try to run . . . try to escape." Fraser said this would include police officers and gang members.

William Gaut testified as an expert in police administration, practices and procedures. He opined that the firearm used in this case could easily fire 11 shots in under five seconds by a rapid pulling of the trigger. Gaut also opined that gray Crown Victorias used for undercover work blend more easily into the pavement so that people are not as likely to notice them and, at night, such a car is less recognizable as a Crown Victoria.

Criminalist Peter Barnett performed a bullet trajectory analysis and opined that the person who fired the shots at the subject Crown Victoria could have been standing on the sidewalk when he did so.

**Closing Arguments**

The prosecution argued that appellant, a West Mob member, armed himself with the assault rifle with the intent to kill rival Big Block member Allen, who appellant believed was responsible for killing West Mob member Dow. Appellant recognized that Espinoza and Parker were police officers and opened fire on them because he did not want to be taken into custody for possession of the assault rifle.

The defense argued that appellant went to Newcomb and Newhall intending to purchase marijuana and was armed with the assault rifle for his safety. Appellant did not know that Espinoza and Parker were police officers and shot at them in self-defense.

Hill, 191 Cal. App. 4th at 1109-16 (footnotes omitted).

It is important to note that Petitioner did not deny that he was at the corner of Newcomb and Newhall at the time of the crime, that he was a member of a gang, that he had an assault rifle and that he shot at Espinoza and Parker. His defense was that he was at Newcomb and Newhall to buy marijuana and that he thought Espinoza and Parker were members of a rival gang who were going to shoot him, so he shot at them in self-defense.

**STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384–86 (2000), while the second prong applies to decisions based on factual determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

United States District Court
For the Northern District of California

prisoner's case." *Id.* at 413. Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Where constitutional error is found, habeas relief is warranted only if the error at issue "had a 'substantial and injurious effect' on the verdict." *Penry v. Johnson*, 532 U.S. 782, 796 (2001); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

In determining whether the state court's decision is contrary to or involved an unreasonable application of clearly established federal law, or is based on an unreasonable determination of the facts, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claims in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If there is no reasoned state court decision on the petitioner's claims, the federal court must conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Plascencia v. Alameida*, 467 F.3d 1190, 1198 (9th Cir. 2006). In the present case, the California appellate court's written opinion on direct appeal is the only reasoned state decision and the Court addresses that decision in its analysis.

## DISCUSSION

Petitioner raises the following claims for habeas corpus relief: (1) due process violation based on the trial court's improper admission of the gang expert's testimony which lowered the prosecution's burden of proof; (2) due process and Confrontation Clause violations based on the trial court's improper admission of the testimony of the gang-expert and other police officers; (3) *Brady* violation based on the prosecutor's failure to disclose exculpatory evidence; (4) due process violation based on the trial court's failure to instruct the jury regarding the prosecutor's opening statement references to a witness who was later determined to be unavailable to testify; (5) due process violations based on prosecutorial misconduct; (6) due process violation based on the trial court's admission of improper rebuttal evidence; (7) Sixth and Fourteenth Amendment violation based on juror misconduct;

and (8) Sixth and Fourteenth Amendment violation based on the trial court's failure to grant his motion for a new trial based on juror misconduct.

## I. First Ground: Prosecution's Burden of Proof

Petitioner argues that the "erroneously-admitted" gang-expert testimony lowered the prosecution's burden of proof in violation of *Sullivan v. Louisiana*, 508 U.S. 275 (1993) and his rights under the Fifth, Eighth and Fourteenth Amendments. Comp. at 11. Respondent argues that this claim is unexhausted and, thus, is subject to dismissal. In his traverse, Petitioner responds that this claim is exhausted because he asserted, in his state appeal, all the errors of the court which cumulatively lowered the prosecutor's burden of proof. Traverse at 5.

An application for a federal writ of habeas corpus filed by a prisoner who is in state custody pursuant to a judgment of a state court may not be granted unless the prisoner has first exhausted state judicial remedies, either by way of a direct appeal or in collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every issue he or she seeks to raise in federal court. 28 U.S.C. § 2254(b), (c); *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987). The petitioner has the burden of pleading exhaustion in his habeas petition. *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981). A petitioner fully and fairly presents a claim to the state courts if he presents the claim (1) to the correct forum, § 2254(c); (2) in the proper manner, *Castille v. Peoples*, 489 U.S. 346, 351 (1989); and (3) includes the factual and legal basis for the claim, *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir.1999). Full and fair presentation requires a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief. *Picard v. Connor*, 404 U.S. 270, 278 (1971). On habeas review, a district court may deny an unexhausted claim on the merits. 28 U.S.C. § 2254(b)(2) (habeas claim may be denied on the merits, notwithstanding the failure of the applicant to exhaust state court remedies).

Petitioner's argument that the presentation to the state courts of all his claims regarding the gang expert's testimony put the courts on notice that he was also asserting a

claim that the prosecutor's burden of proof was reduced by that testimony is without merit. Petitioner's theory would require the state courts to ferret out all potential habeas claims in a petition. They are not required to do so. As stated above, for a claim to be fairly presented, the state courts must be informed of its factual and legal basis. Petitioner failed to do this and, thus, this claim is unexhausted. Notwithstanding the foregoing, the Court did review this issue and denies it on the merits for the reasons set forth below:

It is presumed that jurors follow the instructions given to them by the court. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Here, the trial court instructed the jurors that they could only convict Petitioner if they found that the prosecution had proved his guilt beyond a reasonable doubt. CT at 1656. The court also instructed the jurors that the expert testimony was not binding on them. The expert witness instruction informed the jurors that:

> Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.
>
> . . .
>
> The law does not permit an expert to testify, or offer opinions about, the actual intent, motive or knowledge of any person, including the defendant. For this reason, expert witnesses in this case were not, and could not have been, questioned about a person's actual intent, motive or knowledge. I therefore instruct you that you cannot consider the absence of such expert testimony, or opinions, as evidence of the actual intent, motive, or knowledge of any person.

CT at 1673.

Furthermore, defense counsel, in his closing argument, repeatedly attacked the credibility of Inspector Chaplin's testimony, stressed that the prosecution had not met its burden of proving guilt beyond a reasonable doubt and specifically discussed the meaning of reasonable doubt. RT at 10461-64.

Under these circumstances, there is no support for the premise that the jury's evaluation of the testimony of Inspector Chaplin led them to convict Petitioner without

finding that the prosecution had proved Petitioner's guilt beyond a reasonable doubt. Furthermore, Petitioner fails to identify any Supreme Court authority holding that expert testimony can lower the prosecution's burden of proof. For these reasons, this claim is denied.

**II. <u>Second Ground: Testimony by Gang Expert and Police Officers</u>**

Petitioner argues that his due process and confrontation rights were violated by the admission of hearsay testimony from Inspector Chaplin, the prosecution's gang expert, and eleven police officers.

**A. <u>Federal Law</u>**

**1. <u>Due Process</u>**

The Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991). However, the admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).

Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *Id.* The due process inquiry in federal habeas review is whether the

United States District Court
For the Northern District of California

admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *Jammal*, 926 F.2d at 920.

**2. <u>Confrontation Clause</u>**

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.; see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). The Confrontation Clause applies to all "testimonial" statements. *Crawford*, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51.

For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637).

When the primary purpose of taking an out-of-court statement is to create an out-of-court substitute for trial testimony, the statement is testimonial hearsay and *Crawford* applies. *Michigan v. Bryant*, __ U.S.__, 131 S. Ct. 1143, 1155 (2011). *See, e.g., Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705, 2712-14 (2011) (concluding that forensic lab report, prepared in connection with a criminal investigation, certifying that petitioner's blood alcohol level was above limit for aggravated DUI was testimonial); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310, 329 (2009); *United States v. Bustamante*, 687 F.3d 1190,

1194 (9th Cir. 2012) (document which in essence is an affidavit testifying to the contents of the birth records of a city is functionally identical to live, in-court testimony that an employee of city might have provided and therefore is a testimonial statement). When that was not the primary purpose, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 131 S. Ct. at 1155. The formality of the interrogation, or the lack of it, may inform the court's inquiry as to its "primary purpose." *Id.* at 1160.

**B. Facts**

The state Court of Appeal set forth the facts regarding this claim as follows.

> Pretrial, the prosecution argued for admission of evidence of the Dow murder as relevant motive evidence and evidence a gang expert could rely on when discussing retaliatory motives. Appellant objected on numerous grounds, noting the absence of any evidence that appellant knew or believed that Allen was responsible for Dow's murder. The court granted the motion to admit this evidence.
>
> The prosecution also sought to admit evidence of the federal plea agreements of Big Block members Douglas Stepney and Kim Ellis and of a gang member named Acie Mathews; appellant objected that the confrontation clause as interpreted in *Crawford v. Washington* (2004) 541 U.S. 36, barred this evidence. The prosecutor argued Chaplin was relying on admissions made in the plea agreements, and those statements were admissible as a basis for his expert opinion. In addition, he argued the plea agreements and the statements therein were themselves admissible evidence. The court ruled that if it permitted Chaplin to testify as an expert, he could rely on the statements made in the plea agreements as a basis for one or more of his opinions, but took under submission whether *Crawford* prohibited the introduction of the statements in the plea agreements.
>
> The trial court also ruled that Chaplin's gang expert testimony did not need to be qualified under *People v. Kelly* (1976) 17 Cal.3d 24. Further, the court did not find any item of information relied upon by Chaplin in forming his opinions to be unreliable. The court stated appellant could "attack on cross-examination" any basis for Chaplin's opinions, and any lack of reliability went "to the weight of the evidence and not to the admissibility of the evidence." In reliance on *People v. Thomas* (2005) 130 Cal.App.4th 1202, the court rejected appellant's contention that the confrontation clause barred Chaplin from testifying about hearsay statements underlying his opinions because the statements would not be offered for their truth. The court also rejected appellant's argument that *Crawford* applied to bar the introduction into evidence of the Stepney/Ellis/Mathews federal plea agreements that contained statements Chaplin was relying on in forming opinions, and issued a "tentative ruling" permitting admission of the plea agreements into evidence. The court granted appellant's motion for a "standing" *Crawford* objection to the gang expert testimony. On the issue of whether Chaplin qualified as a gang expert, the trial court stated that it would base its ruling on the evidence elicited at the preliminary hearing and Chaplin's supplemental in limine testimony.
>
> Subsequently, the court found Chaplin qualified to testify "as an expert as to gang matters, specifically African-American gangs in the Bayview/Hunters Point area of

> San Francisco." The court ruled that Chaplin could testify to "gang activity in general," and the "expectations of gang members in general, when confronted with a specific action." However, the court ruled that Chaplin could not testify to appellant's "subjective intent" at the time of the charged crime. It also ruled that "there has been a sufficient showing here that [Chaplin] could talk about the retaliation and gang motivation." Appellant objected, pursuant to Evidence Code section 352, arguing the thrust of Chaplin's testimony was "funneling things he's heard from other people," but the court rejected this argument. Over appellant's objection, the court ruled the prosecution could introduce evidence of 14 separate shootings, including 13 murders and five gunshot injuries, which occurred in the Bayview between early 2000 and February 2004.[1]
>
> After commencement of the jury trial, appellant again protested the introduction of hearsay evidence and Chaplin's reliance on it. Appellant argued that *Thomas* was wrongly decided, the out-of-court statements Chaplin related were introduced for their truth, and much of the proffered hearsay from unnamed people underlying Chaplin's opinion was unreliable. In rejecting appellant's arguments, the court stated that *Thomas* was controlling authority and the statements at issue were not being introduced as direct evidence against appellant, but only to help the jury evaluate Chaplin's opinions. At the end of the case the court provided a limiting instruction regarding portions of Chaplin's testimony: "Chaplin testified that in reaching his conclusions as an expert witness he considered statements made by various individuals. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true."

*Hill*, 191 Cal. App. 4th at 1116-18 (footnote added).

**C. <u>Inspector Chaplin's Qualifications as a Gang Expert</u>**

Petitioner argues that his due process rights were violated when Inspector Chaplin testified as an expert because he was not qualified to do so and specifies five opinions that he was not qualified to render.

The California Court of Appeal thoroughly analyzed the evidence at trial regarding Inspector Chaplin's qualifications to testify as an expert on gangs and concluded that, under California Evidence Code section 702 (a) (qualifying as an expert witness), Inspector Chaplin was qualified to give expert testimony. *See Hill*, 191 Cal. App. 4th at 1118-21. Furthermore, the Court of Appeal analyzed each of the five opinions Petitioner challenges and, under California case law holding that gang sociology, psychology and the expectations of gang members under certain circumstance are proper subjects of expert testimony, found that the testimony was admissible and within Inspector Chaplin's area of expertise. *Id.* at

---

[1]California Evidence Code section 352 provides that a court, in its discretion, may exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice.

1120-21.

On habeas review, a state court's evidentiary rulings are not cognizable. *See* 28 U.S.C. § 2254(a) and, to the extent Petitioner attacks the Court of Appeal's affirming the trial court's evidentiary rulings, the claim fails. Furthermore, the Supreme Court case addressing qualifying expert witnesses in federal court, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is based on a federal rule of evidence, not the Constitution. *Id.* at 594–95. For that reason, California courts are not required to apply it, and in fact do not. *See People v. Leahy*, 8 Cal. 4th 587, 594 (1994). Therefore, Petitioner's claim that the qualification of Inspector Chan as an expert violated his due process rights fails as the Supreme Court has never established the issue as a proper ground upon which to bring a due process claim. Accordingly, the state court's denial of this claim was not contrary to or an unreasonable application of established federal authority. Habeas relief on this claim is denied.

**D. <u>Inspector Chaplin's "Hearsay" Testimony</u>**

Petitioner argues that Inspector Chaplin's testimony based on non-testimonial hearsay statements violated his due process rights because these statements were unreliable as explicated by the Supreme Court in *Ohio v. Roberts*, 448 U.S. 56 (1980).[2] The state Court of Appeal addressed this claim as follows.

> Evidence Code section 801, subdivision (b) limits expert opinion testimony to an opinion "[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates. . . ." "*[A]ny material that forms the basis of an expert's opinion testimony must be reliable.*" (*People v. Gardeley* (1996) 14 Cal.4th 605, 618). As long as this threshold requirement of reliability is satisfied, even matter ordinarily inadmissible, such as hearsay, can form the proper basis for an expert's opinion testimony. (*Ibid.*) Thus, a gang expert may rely upon conversations with gang members, on his or her personal investigations of gang-related crimes, and on information obtained from colleagues and other law enforcement agencies. (*See Gonzalez*, 38 Cal.4th at p. 949 ["A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable."]; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1463; *People v. Gamez* (1991) 235 Cal.App.3d 957, 968, *overruled on other grounds in Gardeley*, at p. 624, fn. 10, 59).

---

[2] *Roberts* was overruled by *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

. . .

Appellant challenges the reliability of the information underlying the following gang expert testimony by Chaplin: (1) his opinion a violent rivalry existed between West Mob and Big Block; (2) his opinion Allen killed appellant's friend, Dow, and the shooting of Espinoza was meant for Allen; and (3) his opinion regarding the thought processes and behavior of gang members. We consider each in order.

**Chaplin's Testimony Regarding the Violent Rivalry Between West Mob and Big Block**

To help establish that appellant had a gang purpose in arming himself with an assault weapon prior to the Espinoza murder, Chaplin provided an opinion regarding the murderous rivalry between West Mob and Big Block. To support that opinion, Chaplin relied, in part, upon 14 shooting incidents (involving 18 victims, 13 of whom were killed) that occurred between 2000 and mid-2004. In each of these incidents he relied on statements he had taken from gang members and members of the community, and/or police reports or discussions with police officers investigating the crimes. Physical evidence, such as gang graffiti, was present at some, but not all, of these shootings and supported Chaplin's opinion that the incidents were related to the West Mob/Big Block rivalry. And separate and apart from these shootings, Chaplin read and relied on the federal plea agreement entered into by former Big Block leader Stepney confirming the existence of a violent rivalry with West Mob.

In contending that the sources of Chaplin's opinion were unreliable, appellant cites *Daubert v. Merrell Dow Pharmaceuticals, Inc*. (1993) 509 U.S. 579 and argues that an expert may not simply rely on hearsay but "must form his opinion by applying his experience and a reliable methodology to the hearsay material upon which he relies." This argument fails for several reasons. First, California has rejected the *Daubert* analysis in favor of the test in *Kelly*, 17 Cal.3d 24. (*People v. Leahy* (1994) 8 Cal.4th 587, 612.) Second, appellant has cited no California authority for the proposition that a gang expert's opinion is subject to the *Kelly* test or that it must be based on a "reliable methodology," and, generally speaking, *Kelly* does not apply to the type of expert testimony provided by Chaplin. . . .Third, the argument that Chaplin simply received and " 'repeat[ed] hearsay evidence without applying any expertise whatsoever' " (*U.S. v. Mejia* (2d. Cir.2008) 545 F.3d 179, 197) ignores the extensive background to which he testified.

To the extent appellant argues that a gang expert may not rely on the hearsay statements of gang members, appellant is wrong. (*Gardeley*, 14 Cal.4th at p. 618; *Duran*, 97 Cal.App.4th at 1463.) *Gamez* is instructive. In that case, the court upheld the admissibility of testimony by gang experts whose opinions were based on personal observations and experience, the observations of other law enforcement officers, police reports, and conversations with gang members. (*Gamez*, 235 Cal.App.3d at ¶. 966-969.)

. . .

The reasoning in *Gamez* is applicable here. Chaplin testified he had worked with the gang task force since 1999, investigating African-American gangs in San Francisco, particularly in the Bayview. He had received training at gang seminars, on-the-job training from other gang task force members, and read books and journal articles about gangs. He had daily conversations with gang members in the Bayview and did follow-up interviews after making gang-related arrests. He had participated in about 600 gang investigations. Although some of the information he received was hearsay, he attempted to corroborate that information.

United States District Court
For the Northern District of California

To comprehend the dynamics of gang rivalry in the Bayview, Chaplin had to be familiar with the typical behavior of Bayview gang members. One significant source of this information was the people involved. Although the credibility of individual gang members might be questionable, Chaplin was not simply recounting or "regurgitating" what he had been told. He made clear that he was relying on his many years of experience and hundreds of communications as one part of the foundation for his testimony. Chaplin's testimony adequately explained the basis for his opinion regarding the West Mob/Big Block rivalry and demonstrated the reliability of the evidence he relied on. (*See Gonzalez*, 38 Cal.4th at p. 949.) No error has been demonstrated.

**Chaplin's Testimony Regarding the Shooting of Dow**

The murder of Dow was one of the 14 shooting incidents described by Chaplin. Appellant argues that no reliable basis exists for Chaplin's testimony that the Dow murder was gang related and that Allen committed it. We disagree. First, there is clear evidence that Dow's shooting was gang related. It was a drive-by shooting and the firearm used was found one week after the shooting in the possession of Joseph Young, a member of a rival gang. Second, Allen was considered a suspect in that shooting by the investigating officers and had told Chaplin that he was a target for retaliation by West Mob "[b]ecause of some shit they think I did." Allen also said the shooting of "Espinoza was meant for me." Third, Allen and Young belonged to the same gang and were close associates in that gang. Fourth, Young himself did not shoot Dow because Young was in custody at the time. Finally, included in the information available to Chaplin were statements by Berry Adams, a West Mob member, describing Adams's role in arming appellant and driving him to Newhall and Newcomb to shoot Allen.

The trial court precluded Chaplin from testifying about statements Adams made to Chaplin after it found Adams legally unavailable to testify as a witness at trial because Adams had invoked his Fifth Amendment right to refuse to answer questions the defense wished to pose regarding uncharged homicides.

Appellant argues that the hearsay provided by Allen was a key piece of evidence relied on by Chaplin to conclude that on April 10, 2004, appellant sought revenge for Allen's murder of Dow. Chaplin testified that on May 3, 2004, he talked with Allen outside Allen's residence at 1662 Newcomb, and Allen provided the statements related above. On cross-examination, Chaplin said he did not know the source of Allen's information. However, Chaplin said that based on what he had discovered throughout the investigation leading up to trial, Chaplin was convinced Allen was correct. Chaplin conceded that, in the past, Allen had lied to police about whether or not he possessed a gun or drugs. But simply because a gang member has lied to the police in the past about his possession of contraband does not preclude a conclusion that he is a reliable source of information supporting a gang expert's opinion. (*See Gonzalez*, 38 Cal.4th at p. 949; *Gamez*, 235 Cal.App.3d at p. 968.)

**Chaplin's Testimony Regarding the Thought Process and Behavior of Gang Members**

Appellant challenges the bases for Chaplin's opinions "as to what gang members think and how they behave, in particular, [Chaplin's] claims that if the intended target is not there, you end up getting someone else, that the killing of a police officer sends the 'ultimate message' of gang reputation, [and] a West Mob member would not go to Newhall and Newcomb except to commit a gang shooting or killing." We have already explained that Chaplin was qualified to provide these opinions, and gang

> expert opinions of this nature have consistently been upheld in the past. (*Olguin*, 31 Cal.App.4th at p. 1370 [importance of respect and exclusive gang turf to street gangs, who react violently to disrespect]; *Gamez*, 235 Cal.App.3d at p. 968, fn. 3 [retaliation]; *Killebrew*, 103 Cal.App.4th at p. 656 [violence results when one gang goes to another gang's turf].) We also previously noted Chaplin's extensive experience and training, which provided reasonable bases for these opinions. Citing *U.S. v. Mejia*, supra, 545 F.3d 179, appellant contends Chaplin failed to explain how he "analyzed his knowledge and experience to reach a studied conclusion." But each of Chaplin's opinions flows logically from his testimony regarding the importance to each gang of its reputation, and how this triggers a retaliatory dynamic of violence. This retaliatory violence, in turn, creates exclusive zones where rival gang members may not go safely. A West Mob member, for example, could not walk safely on Big Block turf. If a West Mob member, armed with an assault weapon, was present on Big Block turf, it is reasonable to conclude he was there to retaliate for prior violence, not to engage in a peaceful pursuit. And if the intended Big Block victim was absent, it is reasonable to conclude the West Mob member would try to shoot a different Big Block member who was present; the shooter would not just "turn around and run out." Finally, when animosity toward the police resulted in the shooting of an officer, the gang's reputation was enhanced by, as Chaplin explained, sending "a message to the community, 'Hey even your protectors can be touched.' "
>
> Because each of the challenged opinions is rooted in other opinions properly reached by Chaplin, admitting them was not an abuse of the trial court's discretion.

*Hill*, 191 Cal. App. 4th at 1121-26 (emphasis in original) (footnotes omitted).

The state appellate court concluded that, because Chaplin did not rely on any unreliable information in reaching his opinions, Petitioner failed to demonstrate any due process violation as the result of Chaplin's expert testimony. *Id.* at 1136 n.23.

The Ninth Circuit has stated:

> Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court. . . . The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. . . . it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

*Holley*, 568 F.3d at 1101 (citations omitted).

As stated above, the due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair, *Walters*, 45 F.3d at 1357, and only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process, *Jammal*, 926 F.2d at 920.

Furthermore, a witness's false or mistaken testimony does not rise to the level of a constitutional violation. *Buie v. McAdory*, 341 F.3d 623, 625 (7th Cir. 2003). "What the

United States District Court
For the Northern District of California

Constitution provides is assurance that evidence may be tested by cross-examination and by contrary proofs. Whether a given expert witness overstated her conclusion is mete for cross-examination . . ." *Id.*

Here, defense counsel cross-examined Inspector Chaplin at length. *See* RT at 9081-9103; 9112-39; 9173-9240. Moreover, in his summation, defense counsel argued that the jury should not credit many of Inspector Chaplin's opinions. *See* RT at 10415-23. Based on the extensive cross-examination of Inspector Chaplin and on the fact that the jury could have properly considered this evidence in evaluating Chaplin's opinions, the admission of this evidence was not so arbitrary or prejudicial that it rendered the trial fundamentally unfair. Accordingly, the California Court of Appeal's denial of this claim was not contrary to or an unreasonable application of established Supreme Court authority.

**E. Admissibility of Out-of-Court Statements Gang Expert Relied on to Support His Opinions**

Petitioner argues that Inspector Chaplin relied on five out-of-court statements which were (i) admitted for their truth in violation of his due process rights and (ii) testimonial and, thus, also violated his rights under the Confrontation Clause. These statements supported two of his opinions that (i) there was an ongoing violent rivalry between the West Mob and Big Block gangs and (ii) Petitioner had a gang purpose in being present at the corner of Newhall and Newcomb while armed with an assault rifle. Four of the five statements Petitioner cites are references to statements from gang members to Inspector Chaplin, to wit: (1) Allen told Chaplin that the Espinoza shooting was "meant for [Allen]"; (2) West Mob member Tony Bedford told Chaplin that he had taken an assault rifle away from younger West Mob members because they were planning a retaliatory shooting on Harbor Road; (3) Kevin Butler told Chaplin that the murder of Hall was possibly an internal West Mob murder; and (4) Terrence Joseph told Chaplin that West Mob members could not buy drugs at Newhall and Newcomb. The last relates to Stepney's federal plea agreement in which he stated he had been the leader of Big Block since its inception, and had been involved in a "war" with West Mob and participated in drive-by shootings.

United States District Court
For the Northern District of California

**1. Due Process**

The California Court of Appeal undertook an in-depth analysis of California law standing for the proposition that an expert witness may, on direct examination, provide the reasons for an opinion as well as the information upon which it is based, even if that information is inadmissible. *Hill*, 191 Cal. App. 4th at 1127-33 (citing Cal. Evid. Code §§ 801(b), 802; *People v. Catlin*, 26 Cal. 4th 81, 137 (2001)). The admission of this potentially inadmissible evidence is allowed because the out-of-court statements are not to be considered for their truth, but only to allow the jury to evaluate the expert's opinion. *Id.* at 1128-29. The Court of Appeal critiqued this rule on the ground that the jury first would have to determine whether the statements were true or false in order to evaluate the expert's opinion. However, it held that, under present California authority, the statements to which Petitioner objected were properly admitted by the trial court as support for Inspector Chaplin's opinions. *Id.* at 1137.

As discussed above, defense counsel extensively cross-examined Chaplin and the jury could properly consider this evidence to evaluate Chaplin's opinions. Based upon this and, in light of the lack of established Supreme Court authority regarding the admission of prejudicial evidence as a denial of due process, the state appellate court's denial of this claim was not contrary to or an unreasonable application of established federal authority. Therefore, Petitioner's due process claim based on the admission of Inspector Chaplin's testimony regarding the facts underlying his opinions does not warrant habeas relief.

**2. Confrontation Clause**

Petitioner argues that, even if the statements were not admitted for their truth, they were inadmissible under *Crawford* and *Tennessee v. Street*, 471 U.S. 409 (1985).[3]

---

[3]The California Court of Appeal, citing section 353 of the California Evidence Code (failure to make a timely objection to, or motion to exclude or strike, inadmissable evidence waives right to complain of the erroneous admission of evidence), found the claim based on *Street* procedurally defaulted because Petitioner failed to raise the argument at trial. *Hill*, 191 Cal. App. 4th at 1131 n.19. The doctrine of procedural default bars a federal habeas court from reviewing a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment," *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), unless the petitioner can show cause for the failure to properly present the claim and actual prejudice, or that the failure to

The state Court of Appeal analyzed each of the five allegedly objectionable statements and found that four of them were not testimonial in nature. The court reasoned as follows.

> Allen provided his statement to Chaplin in an informal, unstructured setting. While driving in the vicinity of Newhall and Newcomb, Chaplin saw Allen run into his residence. Chaplin talked to two men outside the residence and then Allen came outside and Chaplin talked to him. There is no evidence that Allen was under arrest or that the circumstances surrounding the conversation were sufficiently formal that Allen's statements were analogous to testimony. Chaplin had worked on the gang task force since 1999 and, in his role as a gang expert, he spoke with gang members on a daily basis, "[w]henever [he was] in the Bayview." Nothing distinguishes the nature of his conversation with Allen from hundreds of others he had conducted. Further, nothing in the record suggests that Chaplin was investigating Espinoza's murder at the time of the conversation with Allen, or that his purpose in engaging in the conversation was to develop information regarding that homicide or any other specific crime. In fact, though Chaplin prepared a field interview card concerning this conversation on the date it occurred, he did not record Allen's statement that the Espinoza shooting had been "meant for him" until a year later. This conversation lacked any indicia of testimony and, under *Crawford* and *Davis*, Allen's statements were not testimonial. . . .
>
> Similarly, Chaplin's interviews with gang members about the rivalry between West Mob and Big Block, and with Bedford, Butler and Joseph, were not testimonial. Many, perhaps all, of these statements were obtained from people in custody. However, as discussed above, in his role as a gang expert, Chaplin constantly interviewed Bayview residents, including gang members, to learn about gang structure, culture and sociology. The custodial status of the interviewees, without more, is not enough. We have no basis for concluding Chaplin's interviews were part of a specific criminal investigation or that any participant in these conversations had, as a primary purpose, "to establish or prove some past fact for possible use in a criminal trial." . . . The statement elicited in these interviews are no more testimonial than the facts recited in a treatise read by an expert in an academic setting, as he or she develops expertise in the field.
>
> The federal plea agreement containing Stepney's statements testified to by Chaplin is, however, the type of formalized document that *Crawford* and *Davis* would treat as testimonial. . . . If we treat Stepney's statements as admitted for their truth, their admission would violate the confrontation clause.

*Hill*, 191 Cal. App. 4th at 1136-37 (footnote omitted).

In a footnote, the state Court of Appeal found that the admission of the Stepney plea agreement, though error, was not prejudicial, even under the stringent test in *Chapman v.*

---

consider the claim would result in a fundamental miscarriage of justice, *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977). The fact that the state court barred this claim based on a California rule of evidence and not a federal question satisfies the first prong of the procedural bar doctrine. Furthermore, the Ninth Circuit has held that California's failure-to-object procedural bar is adequate to prohibit federal habeas review of the claim at issue. *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995). Thus, the second prong of the procedural bar rule is satisfied. Petitioner fails to show cause and prejudice or a fundamental miscarriage of justice. Accordingly, Petitioner's Confrontation Clause claim based on *Street* is procedurally defaulted and is dismissed on this basis.

*California,* 386 U.S. 18, 24 (1967), which requires reversal unless the prosecution demonstrates the error was harmless beyond a reasonable doubt. *Hill,* 191 Cal. App. 4th at 1137 n.24. The court found that, because admissible evidence of a violent gang war between West Mob and Big Block was overwhelming and undisputed, the error would be harmless beyond a reasonable doubt. *Id.*

The statements Inspector Chaplin was told by Allen and other gang members do not qualify as testimonial under *Crawford* and its progeny. As indicated by the state court, Inspector Chaplin's job was to learn about gang culture, structure and sociology and, as part of that job, he spoke to many gang members. The record lacks any evidence that Inspector Chaplin gathered any of the statements to which Petitioner objects as part of a specific investigation or that any of the individuals to whom Inspector Chaplin spoke had the purpose of establishing or proving a fact for possible use in a criminal trial. Therefore, the state court's conclusion that *Crawford* did not apply to the four statements from gang members because they were not testimonial was not an unreasonable application of clearly established federal authority.

With respect to the fifth and final statement, the state court reasonably found that the plea agreement that was admitted into evidence was testimonial in nature and, thus, its admission violated *Crawford*. *See United States v. McClain*, 377 F.3d 219, 221 (2nd Cir. 2004) (plea allocution constitutes testimony because it is given under oath and in response to questions by court or prosecutor). However, the state court also reasonably found that the admission of the plea agreement was not prejudicial under the stringent *Chapman* standard of analyzing prejudice. In federal habeas proceedings the *Brecht* prejudicial standard applies. Under this standard, which is not as stringent as *Chapman*, Petitioner has not shown prejudice because, as indicated by the state court, the record shows other undisputed evidence of a violent gang war between West Mob and Big Block. Furthermore, this evidence aided Petitioner in his defense because he argued that he thought Espinoza and Parker were members of a rival gang and he was afraid they would shoot him if he did not shoot first. Thus, the admission of the plea agreement did not have a substantial and

injurious effect on the outcome of the trial.

Accordingly, Petitioner's claim based on Confrontation Clause violations is denied.

**F. Admissibility of Eight Predicate Gang-Related Offenses and Fourteen Gang Shootings**

Petitioner argues the admission of Chaplin's testimony recounting eight gang-related offenses and fourteen gang shootings violated his due process rights as the evidence was duplicative and prejudicial.

**1. Eight Gang-Related Offenses**

The California Court of Appeal denied this claim as follows.

> Chaplin testified to eight predicate offenses to prove that appellant possessed an assault rifle for the benefit of, at the direction of, or in association with a criminal street gang (Pen. Code, §§ 12280, subd. (b), 186.22, subd. (b)(1)). "To prove the allegations under section 186.22, subdivisions (a) and (b), the prosecutor was required to establish that one of the gang's primary activities was the commission of one or more of the crimes listed in [Penal Code] section 186.22, subdivision (e), and that the gang's members engaged in a pattern of criminal activity. [Citation.] '. . . [S]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.' [Citation.] [A] 'pattern' is established by the commission of two or more enumerated offenses committed on separate occasions or by two or more persons. [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 608-609.)
>
> Prior to trial, the prosecution sought to admit evidence of 10 predicate offenses allegedly committed by West Mob members beginning in 1999. In response, appellant argued that, pursuant to Evidence Code section 352, the prosecution should be limited to eliciting evidence of three predicate offenses, and none of the predicate offenses should include offenses by appellant's family members.
>
> The court said it understood the prosecution's need to present evidence of more than the two statutorily required predicate offenses, and exercised its discretion to allow proof of eight such offenses through court documents and the testimony of Chaplin. Appellant argues four predicate offenses would have been "sufficiently safe to withstand theoretical challenges," and therefore the admission of eight such offenses was cumulative and unduly prejudicial (Evid. Code, § 352).
>
> . . .
>
> The trial court here exercised its discretion and eliminated two offenses the prosecution sought to introduce. . . . No error occurred.

*Hill*, 191 Cal. App. 4th at 1137-39 (emphasis in original) (footnote omitted).

This evidence was relevant to establishing the charge that Petitioner possessed the assault rifle in association with a criminal street gang and, thus, the jury could draw permissible inferences from it. For these reasons and because no Supreme Court authority

holds that such evidentiary rulings can be unconstitutional, the state Court of Appeal's denial was not contrary to or an unreasonable application of established federal authority.

**2. Fourteen Gang Shootings**

The State Court of Appeal addressed this claim as follows.

> We ruled . . . above, that Chaplin properly relied on the 14 prior gang-related shootings, most of which resulted in homicides, to support his opinion that there was a violent gang rivalry between West Mob and Big Block. This opinion, in turn, supported other opinions Chaplin provided, such as gangs establish their own "exclusive" turf and members of rival gangs who "trespass" on that turf do so for a gang-related purpose. . . . Cumulatively, these opinions were admissible to establish that appellant possessed the assault weapon for a gang-related purpose, as alleged in the enhancement to count 4. . . . Appellant argues the trial court erred in permitting Chaplin to relate the details of each of these shootings to the jury because the limited probative value of this evidence was substantially outweighed by its undue prejudice. (Evid. Code, § 352.)
>
> It is noteworthy that appellant admitted his membership in West Mob and never explicitly disputed the existence of gang violence involving West Mob. While objecting to evidence of certain specific acts of violence, appellant not only conceded the widespread gang violence in the Bayview, but relied on it as the cornerstone of his defense from the first lines of his opening statement. Thus we assume, without deciding, that it was error to permit Chaplin to relate the details of all 14 shooting incidents.
>
> In determining whether this error would be reversible, we apply the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, under which the appellate court must determine if it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*Williams*, 170 Cal.App.4th at p. 612.) Under *Watson*, we examine the errors made in the context of the entire record to determine if reversal is required. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)
>
> The evidence of the 14 prior gang-related shootings was directly relevant to establish the gang purpose alleged in count 4, possession of the assault rifle. Even if the trial court erred in admitting this evidence, under the *Watson* standard we conclude the error was harmless. The primary danger flowing from admission of these other gang-related crimes evidence is its tendency to persuade the jury that the defendant "had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished." (*Albarran*, 149 Cal.App.4th at p. 230; *see also People v. Memory* (2010) 182 Cal.App.4th 835, 859.) Such evidence may, therefore, create an emotional bias against the defendant that impacts the jury's determination of all of the charges, not just the gang enhancement. (*Albarran*, at p. 230.) But this danger was much reduced because in this case none of the shootings involved appellant. In addition, it is clear that the "jury's passions were [not] inflamed by the evidence of [the] uncharged offenses." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) The prosecutor sought a first degree murder verdict and argued that the evidence established premeditation and deliberation in the shooting of Espinoza. But the jury rejected this and found only murder of the second degree. (Cf. *Williams*,170 Cal.App.4th at ¶. 612-613.) Finally, appellant's trial strategy undermines his claim of prejudice. (*See People v. Jennings* (2010) 50 Cal.4th 616, 653.)



United States District Court
For the Northern District of California

*Hill*, 191 Cal. App. 4th at 1139-41.

Because Petitioner not only conceded that he was a member of the West Mob gang and that widespread violence in the Bayview existed, his defense relied on these circumstances. The state Court of Appeal concluded that the admission of the details of fourteen separate gang-related shootings was therefore not necessary to establish the gang purpose alleged in connection with the charge of possession of an assault rifle. The Court of Appeal then explicitly "assume[d], without deciding" that the trial court erred in admitting this evidence because its limited probative value was outweighed by its prejudice. However, as stated above, no Supreme Court authority establishes *constitutional error* based on the admission of prejudicial evidence. The Court of Appeal's ultimate conclusion of "no prejudice" is not contrary to or an unreasonable application of established federal authority. The state court relied on the prejudice standard in *Watson*, which is similar to the *Brecht* standard of prejudice applied in habeas proceedings. As the Court of Appeal indicated, prejudice against Petitioner was allayed because none of the shootings involved him. Furthermore, the jury rejected the prosecutor's argument that the evidence established premeditation and deliberation because it acquitted Petitioner of first degree murder and found him guilty only of murder in the second degree. And, because Petitioner's trial strategy relied upon the fact that extreme violence between rival gangs predominated, he cannot claim prejudice because the prosecution introduced evidence of gang violence. Therefore, the admission of this evidence did not have a substantial and injurious effect on the outcome of the trial. Habeas relief is denied on this claim.

**G. <u>Cumulative Error</u>**

Petitioner contends that the cumulative effect of the trial court's errors in admitting Chaplin's testimony violated his Sixth and Fourteenth Amendment rights to a fair trial.

In a footnote, the state Court of Appeal denied this claim, stating, "Because we do not find multiple errors in the court's rulings on the expert testimony, appellant's request for a cumulative error analysis is moot." *Hill*, 191 Cal. App. 4th at 1141 n.27.

In some cases, although no single trial error is sufficiently prejudicial to warrant

reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003). However, where no single constitutional error exists, nothing can accumulate to the level of a constitutional violation. *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Similarly, no cumulative error is found where only one error exists. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

Because the Court has found that the state Court of Appeal's rulings on Petitioner's claims regarding the gang expert's testimony were not contrary to or an unreasonable application of Supreme Court authority, no constitutional error has been found and, thus, there can be no cumulative error. Accordingly, the claim based on cumulative error is denied.

**H. <u>Hearsay Testimony from Other Police Officers</u>**

Petitioner argues that the admission of numerous hearsay statements by police officers not testifying as experts violated his due process rights. The state Court of Appeal denied this claim as follows.

> Appellant next contends the court erred in overruling his hearsay and relevancy objections to testimony by 11 different police officers to support the prosecution's theory that it was common knowledge in the Bayview that police officers patrolled in unmarked police cars and gang members alerted each other to the presence of such unmarked police cars. The trial court found the evidence relevant and overruled the hearsay objections on the ground the evidence was not admitted for its truth.
>
> Appellant expressly points to the following testimony:
>
> (1) Parker testified that young men he believed to be West Mob members told him, "we can see you coming a mile, miles away."
>
> (2) Former San Francisco Police Officers Scott Kendall and Stephen Jonas testified that while patrolling the Bayview in plain clothes and in unmarked police cars, each would sometimes exit the patrol car and, while on foot have conversations with young men thought to be West Mob members. Each witness testified these young men would sometimes be adversarial and would say things such as, "Fuck the police," "Fuck you," "You guys are always hassling us," "What the fuck are you looking at," and "Get the fuck out of here."
>
> (3) San Francisco Police Officer Len Broberg testified that, in 2002, he saw graffiti in the Bayview that said, "Fuck Officer Len and the White Ghost," with Broberg's name crossed out.

> (4) Numerous San Francisco police officers testified that sometimes, while patrolling the Bayview in plainclothes and in an unmarked police car, they would hear people mimic a siren or give verbal signals or alerts that the police had arrived such as, "oh, oh, oh," "wooop," "five-oh on the block," "po-po," "white whale," "gray ghost," "woo-woo," "yo," "lay-ow, lay-ow," "aye-oh" and "roller."
>
> The trial court's ruling on the admissibility of evidence are reviewable for abuse of discretion. Hearsay evidence is evidence of a statement made by an out-of-court declarant that is offered to prove the truth of the matter stated and is inadmissible unless the proffered evidence comes within an exception to the hearsay rule. (Evid. Code, § 1200). Thus, if an extrajudicial utterance is offered without reference to the truth of the matter asserted, the "[h]earsay rule" does not apply.
>
> Statements (2) through (4), listed above, were not admitted for their truth, but only to show that gang members were hostile to the police or recognized unmarked police cars. Even if statement (1) were [sic] admitted for its truth, any error in overruling the defense objection to it would have been harmless because of the large volume of other admissible evidence to the same effect.

*Hill*, A117787 at 40-42 (some citations omitted).[4]

As stated above, the Supreme Court has made very few rulings on whether the admission of evidence can be a denial of due process. *Holley*, 568 F.3d at 1101. The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters*, 45 F.3d at 1357; *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986). And, a violation may be found only if there were no permissible inferences from such evidence that the jury could have drawn. *Jammal*, 926 F.2d at 920. Furthermore, to obtain habeas relief on the basis of an evidentiary error, a petitioner must also show that the constitutional error had a "substantial and injurious effect on the verdict." *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting *Brecht*, 507 U.S. at 623). Thus, even if the statements at issue were admitted for their truth in violation of the California rule of evidence prohibiting the admission of hearsay evidence, habeas relief could not be granted unless their admission rendered the trial fundamentally unfair, the jury could draw no permissible inferences from them, and they had a substantial and injurious effect on the verdict.

Petitioner argues that the Court of Appeal wrongly concluded that the statements at

---

[4]This claim and the following claims were not certified for publication and, thus, were not published in the Westlaw version of the appellate court opinion. All further citations to this opinion are to Respondent's Exhibit F, *People v. Hill*, A117787 (Jan. 13, 2011).

issue were not admitted for their truth. Petition at 19. He argues that the testimony that Bayview residents identified and alerted others to unmarked police cars was used by the prosecution to prove that, because "everyone knew it, . . . Petitioner did too." *Id.* Similarly, in his traverse, Petitioner argues that this evidence was wrongly admitted because it "cut to the heart of Petitioner's defense that when the unmarked car approached him slowly he reacted in (unreasonable) self defense (not knowing it was a police car)." Traverse at 6. In support of his argument, Petitioner cites two state court cases, *People v. Vargas*, 9 Cal. 3d 470, 481 (1973) and *People v. Lindsey*, 205 Cal. App. 3d 112, 117 (1988). However, these cases are not applicable to this due process claim: *Vargas* addressed a *Griffen* error claim and *Lindsey* addressed a prosecutor misconduct claim. *Vargas*, 9 Cal. 3rd at 481; *Lindsey*, 205 Cal. App. 3d at 117.

Petitioner's argument that he is entitled to relief because the statements were hearsay fails to state a claim under the federal habeas authorities cited above. Petitioner is correct that this evidence cut to the heart of his defense. However, this is why the statements were relevant. The jury could properly infer from this evidence that, because many people in the Bayview recognized unmarked police cars, Petitioner did also. Although the same testimony from eleven officers may have been cumulative or redundant, it did not have a substantial and injurious effect on the verdict because the jury properly could have heard similar testimony from a lesser number of officers. And, as pointed out by the Court of Appeal, other admissible evidence established that gang members were hostile to the police, also decreasing the prejudicial impact of this evidence.

Furthermore, as Respondent argues, defense counsel made use of these witnesses by eliciting testimony from some of the officers that Bayview residents would give unmarked police cars nicknames like "gray ghost" or "white ghost" indicating that they sometimes snuck up on people, like a ghost. RT at 6666-67; 7525; 7625; 7780-81. This supported the defense theory that, because Petitioner did not know the car Espinoza and Parker was driving was a police car, and believed that they were rival gang members, he shot them in self-defense. In his closing argument, defense counsel reiterated that people often get surprised

United States District Court
For the Northern District of California

by "the gray ghost." RT at 10437; 10380-81; 10449.

Based on this, the allegedly inadmissible hearsay evidence did not render the trial fundamentally unfair and did not have a substantial and injurious effect or influence on the outcome of the trial. *See Brecht*, 507 U.S. at 619. Therefore, habeas relief on this claim is denied.

**III. <u>Third Ground: Brady Violation</u>**

Petitioner contends that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963) in regard to proposed prosecution witness Berry Adams, a West Mob gang member. Petitioner also argues that the trial court erred in refusing to give an instruction requested by defense counsel regarding the prosecutor's opening-statement references to Adams.

**A. <u>Federal Law</u>**

The government has an obligation to surrender favorable evidence that is "material either to guilt or to punishment," even if the defendant does not request disclosure of such evidence. *Brady*, 373 U.S. at 87; *United States v. Agurs*, 427 U.S. 97, 107 (1976). To establish a *Brady* violation, the defendant must show that the favorable evidence was suppressed by the state, either willfully or inadvertently, resulting in prejudice. *Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006). Both exculpatory and impeachment evidence may be favorable to the accused under the *Brady* standard. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682 (citation omitted). A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* The terms "material" and "prejudicial" are used interchangeably. *Bailey v. Rae*, 339 F.3d 1107, 1116 n. 6 (9th Cir. 2003). Where the undisclosed impeachment evidence would have provided no independent basis for impeaching the witness separate from evidence already known to and utilized by the defense, no *Brady* violation will be found. *United States v. Kohring*, 637 F.3d 895, 908 (9th Cir. 2011).

United States District Court
For the Northern District of California

**B. Facts**

The state Court of Appeal summarized the facts regarding the *Brady* claim as follows.

> Prior to trial, on March 14, 2006, defense counsel stated that the prosecutor had declared his intention to have Adams testify at trial; and, therefore, defense counsel asked for "full discovery" regarding Adams, including "*Brady* material." On July 12, 2006, at an Evidence Code section 402 hearing regarding Adams's interaction with appellant on the night of April 10, 2004, Adams invoked the Fifth Amendment, was granted immunity and ordered to testify regarding the Espinoza murder.[5] Defense counsel stated he still did not have full discovery regarding Adams, particularly regarding statements made by appellant to Adams. On numerous other occasions, appellant sought *Brady* material regarding Adams, including material in the hands of federal authorities. On October 10, 2006, following jury selection, the prosecutor provided the defense with discovery documents regarding Adams, which the federal court had ordered released pursuant to a federal protective order.
>
> During his opening statement on October 16, 2006, the prosecutor described the role Adams had played in the events of April 2004: (1) a few days before Espinoza was killed, Adams took appellant and West Mob member Hamilton to the San Ramon apartment of West Mob member Marvin Jeffery, where assault weapons were provided to appellant and Hamilton; (2) on the day of the shooting, appellant telephoned Adams and said he had "a line on" Dow's killer; (3) appellant decided to avenge Dow's murder by killing Dow's murderer, Allen, and Allen lived near the intersection where Espinoza was killed: (4) after killing Espinoza, appellant asked Adams to pick him up at his grandmother's house, which Adams did; (5) Adams then drove appellant to Oakland; and (6) appellant ended up at Jeffery's San Ramon apartment.
>
> On October 23, 2006, at the conclusion of the 402 hearing, defense counsel asserted there was a joint federal/state investigation of Adams and requested all *Brady* material on Adams in the possession of the federal authorities. On November 6, appellant submitted a written request for federal *Brady* material regarding Adams and others. Defense counsel requested that Adams not testify due to the prosecutor's *Brady* violation. The trial court denied, without prejudice, the motion to exclude Adams, but excused the jury for a week to review the issues involved.
>
> Later that day at a defense ex parte hearing, the court reviewed two FBI incident reports (called "302's") just received from the United States Attorney, which defense counsel stated established the *Brady* violation and should bar Adams as a witness. The two documents regarded FBI interviews with Adams conducted in November and December 2004 that defense counsel said were exculpatory because Adams repudiated "the heart of what he has to say in this case" as a prosecution witness. Adams's statements were made in the presence of San Francisco Police Officer Robert Macmillan, an officer "cross-designated" as a gang expert between state and federal authorities, and San Francisco Police Officer Michael Philpott. Defense counsel argued that if the court was unwilling to exclude Adams as a witness, the two 302's should not be revealed to the prosecution and the jury should be instructed that there was a *Brady* violation. The court deferred the request to exclude Adams until his testimony at a 402 hearing.

---

[5]California Evidence Code section 402 provides that, when the existence of a preliminary fact is disputed, the court may hear and determine the question of admissibility of evidence out of the presence or hearing of the jury.

On November 8, 2006, the federal prosecutor provided defense counsel and the state prosecutor with the two 302's regarding Adams that the court had considered at the ex parte hearing on November 6. Defense counsel asserted there was a "serious *Brady* issue" because the two reports had been withheld from the defense. Thereafter, defense counsel conceded he had been provided with the reports in May 2005, but insisted the prosecutor had still violated *Brady*. Defense counsel stated that at the time he received the reports in May 2005, it "wasn't that important to me" because Adams was not a "substantial" witness in the case. However, defense counsel said the two 302's were *now* of "central importance" because the prosecutor was "putting [Adams] at the center of the case" based on Adams's claims about his telephone call with appellant on the day of the shooting. He also argued that in late 2004, when Adams made the statements in the 302's, Adams was out of custody and had not yet made the incriminating statements on which the prosecutor intended to rely.

At the November 9, 2006 continued 402 hearing, Macmillan testified that in 2004 he was sworn in and cross-designated to perform certain federal duties and investigations. He admitted being present on November 22, 2004, when FBI agents took a statement from Adams at the San Mateo County jail. Macmillan said he did not take notes or record the interview and did not provide a 302 to Pera, Toomey or the prosecutor.[6] Macmillan said he and Philpott (also cross-designated) were present on December 1, 2004, when FBI agents took another statement from Adams at the San Mateo County jail. Again, Macmillan did not tape, create notes, or provide a report regarding the December 1 statement to Pera, Toomey or the prosecutor. The December 1 interview of Adams focused almost completely on the death of Espinoza and the prosecution of appellant. A week later, Macmillan told Pera that Adams's second statement, from December 1, contradicted a statement took from Adams in July 2004. Specifically, in the July 2004 statement, Adams denied driving appellant and Hamilton "to San Francisco from Oakland"; in the December 2004 statement, Adams said he did so. Macmillan did not otherwise discuss the December 1 statement with Pera.

The court found that the two incident reports regarding Adams were material statements and the prosecutor violated section 1054 by failing to timely disclose them. However, it concluded there was no *Brady* violation and no prejudice to the defense because the defense was already in possession of the information.[7]

Subsequently, at a closed hearing, Adams stated he would invoke his Fifth Amendment right not to testify as to three unrelated homicide cases between 1997 and 2001 and various other offenses that the defense wished to cross-examine him on. Adams was prepared to testify regarding the other offenses. The court stated that, because Adams had invoked the Fifth Amendment, the defense could not effectively cross-examine him. *At the request of the defense*, the court ruled Adams unavailable as a witness.

The court proposed a witness unavailability instruction regarding Adams, which it ultimately provided to the jury: "On November 16, 2006, the [c]ourt declared . . . Adams legally unavailable to be a witness at trial. Neither the [p]rosecutor nor the [d]efense is responsible for that legal unavailability. The jury must not draw any inference as to any matter at issue in the trial from the fact that . . . Adams was legally

---

[6]San Francisco Homicide Inspectors Holly Pera and Joseph Toomey were responsible for the investigation of Officer Espinoza's homicide. RT 7431.

[7]California Penal Code section 1054 provides that there shall be informal and timely discovery between the parties.

> unavailable to be a witness." The court rejected the defense request to modify the instruction to add, "The jury should not consider for any reason any reference to . . . Adams made during opening statement by the district attorney or the defense."

*Hill*, A117787 at 42-45 (emphasis in original) (footnotes added).

**C. Analysis**

In his state petition, Petitioner argued that the two Adams statements made in 2004 and memorialized in 302's was not provided to defense counsel by the prosecutor until November 2006, two weeks after the prosecutor's opening statement, so that counsel was not able to counter the impact of the prosecutor's opening statement. The state appellate court noted that Petitioner ignored the fact that defense counsel had received the 302's from an independent source long before the prosecutor's opening statement. On this basis, the appellate court held that there was no *Brady* violation because counsel was not unaware of the alleged *Brady* material and had all that was necessary to ensure a fair trial. *Hill*, A117787 at 46 (citing *People v. Salazar*, 35 Cal. 4th 1031, 1042-43 (2005)).

Petitioner argues that the appellate court's reasoning is contrary to or an unreasonable application of *Brady*. However, federal law is in *accord* with *Salazar*, the state case on which the state appellate court relied. Under Ninth Circuit authority interpreting *Brady*, a defendant cannot claim a *Brady* violation if he was "aware of the essential facts enabling him to take advantage of any exculpatory evidence." *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986); *Rhoades v. Henry*, 638 F.3d 1027, 1038-39 (9th Cir. 2011) (no disclosure violation where one of three reports pertaining to the same confession was turned over and the reports that were withheld added no details to what was available from the other sources).

Here, in May 2005, defense counsel received from a source other than the district attorney, the FBI reports of Adams's interviews that are exculpatory. Therefore, counsel was in possession of this information more than one year before the beginning of Petitioner's trial in October 2006. Counsel's statement that, at the time he received the information, he was not aware of its significance because the district attorney had not indicated that Adams would be a substantial witness in the case, is not persuasive. At some point before the trial, counsel became aware that Adams's testimony would be important to the prosecution's case. With



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

counsel's knowledge of Adams's exculpatory statements, he would be prepared to impeach Adams had he testified.

Petitioner also argues that the state appellate court's opinion was based on an unreasonable determination of the facts because the court only addressed the two exculpatory reports that the prosecution failed to disclose to defense counsel, and not other undisclosed reports containing Adams's incriminating statements. Petition at 8. Respondent disagrees and contends other than the two reports regarding Adams that defense counsel already had, no other FBI reports existed Even if the prosecution failed to disclose inculpatory reports, this claim fails because no constitutional requirement exists that defendants in state court proceedings be given notice of inculpatory evidence the prosecution plans to introduce at trial. *See Gray v. Netherland*, 518 U.S. 152, 168-70 (1996); *Coleman v. Calderon*, 150 F.3d 1105, 1112 (9th Cir. 1998) *rev'd on other grounds*, 525 U.S. 141 (1998). Therefore, the state court's determination of the facts was not unreasonable. Petitioner's *Brady* claim is denied.

**IV. <u>Fourth Ground: Jury Instruction</u>**

Petitioner next claims that the trial court should have provided an additional instruction to the jury related to the prosecutor's opening statement referencing Adams.

The state Court of Appeal denied this claim as follows:

> After the trial court granted appellant's request to exclude Adams's testimony, appellant requested that the jury be instructed that it "should not consider for any reason any reference to . . . Adams made during opening statement by the district attorney or the defense." Appellant argues the trial court's refusal to do so violated his rights to due process and a fair trial.
>
> . . .
>
> Appellant contends the court had a duty to instruct "as to what is *not* evidence." Appellant further argues that his requested instruction was a pinpoint instruction related to the defense theory of the case, i.e., that Adams was a liar and Adams's statements, referred to in the prosecutor's opening statement, were untrue.
>
> Though imaginative, this argument fails. Upon request, the trial court must give jury instructions that pinpoint a theory of the defense, but it may refuse instructions that highlight "specific evidence as such." Appellant succeeded in his efforts to obtain a court ruling barring Adams from testifying. It is illogical for appellant to argue that, following this ruling, a "theory" of his defense was that Adams's *testimony* was a lie and he was entitled to a pinpoint instruction supporting this *theory*. Further, the trial court need not give a pinpoint instruction if it merely duplicates other instructions.

> We conclude the instructions given by the court adequately informed the jury that it was to decide the case based solely on the evidence and that counsel's opining statement was not evidence. "In the absence of evidence to the contrary, we presume the jury followed the court's instructions."

*Hill*, A117787 at 47-48 (emphasis in original).

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *Estelle*, 502 U.S. at 71-72. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Id.* at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).

Citing *Kelly v. South Carolina*, 534 U.S. 246, 256 (2002) and *Mathews v. United States*, 485 U.S. 58, 62 (1988), Petitioner argues that the trial court violated his due process rights by refusing to instruct the jury not to consider the prosecutor's opening statement references to Adams. Petition at 8. However, the state appellate court reasonably concluded that both instructions to the jury that (i) opening statements are not evidence and (ii) the jury must decide the case only upon the evidence, were adequate to inform the jury of its obligations which did not include basing its decision on the prosecutor's statements. *See* CT 1649 (preliminary instruction that opening statements are not evidence); RT 10489 (closing instruction that jury must decide case based only upon the evidence and that attorneys' remarks in opening statements and closing arguments are not evidence). Neither *Kelly* nor *Mathews* is applicable. *Kelly* was a capital case where the court refused to give the jury an instruction at sentencing that Kelly would not be eligible for parole should the jury decide not to sentence him to death. 534 U.S. at 248. The Court concluded that this was a misapplication of *Simmons v. South Carolina*, which held that when a "capital defendant's

future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility,' . . ." *Id.* (citing *Simmons v. South Carolina*, 512 U.S. 154 (1994)). The instruction at issue in *Kelly*, which would influence the jury's determination of whether the defendant was sentenced to life or death, is not the type of instruction at issue here, which would only duplicate other instructions informing the jury not to consider the prosecutor's opening remarks as evidence. *Mathews* is not applicable to the facts here because it addressed the circumstances under which a defendant is entitled to an entrapment instruction. 485 U.S. at 62.

Therefore, the state Court of Appeal's denial of this claim was not contrary to or an unreasonable application of established federal authority. This claim for habeas relief is denied.

**V. <u>Fifth Ground: Prosecutorial Misconduct</u>**

In addition to the *Brady* claim discussed above, Petitioner presents three separate claims based on prosecutorial misconduct, namely that the prosecutor: (1) by referencing Adams in his opening statement created a separate *Brady* violation; (2) commented on Petitioner's decision not to testify in violation of *Griffin v. California*, 380 U.S. 609 (1965); and (3) improperly cross-examined defense witness Scott Fraser.

**A. <u>Federal Law</u>**

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). Even if the prosecutor's actions constituted misconduct, when a curative instruction is issued, the court presumes that the jury has disregarded inadmissible evidence inadvertently presented to it and that no due process violation occurred. *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477 U.S. at 181-82 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair because

United States District Court
For the Northern District of California

curative instructions were given by the trial judge).

Other factors which the court may take into account in determining whether prosecutorial misconduct rises to the level of a due process violation are: (1) the weight of the evidence of guilt, *see United States v. Young*, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct related to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972); and (4) whether the prosecutor's comment misstated or manipulated the evidence, *see Darden*, 477 U.S. at 182.

**B. Brady Claim**

Petitioner argues that the prosecutor committed misconduct by referring, in his opening statement, to the inculpatory testimony that Adams would give because the prosecutor “should have known Adams would be legally unavailable to testify.” Petition at 9. The state appellate court addressed this claim in a footnote, concluding that it failed because it depended upon the incorrect assumption that a *Brady* error was committed. *Hill*, A117787 at 46 n.29.

The state appellate court’s ruling was not unreasonable. Furthermore, the facts disprove Petitioner’s theory that the prosecutor knew that Adams would not be able to testify. The trial court’s decision to declare Adams legally unavailable was made in November 2006, approximately a month after the prosecutor gave his opening statement. The court made this decision after Adams, in a closed hearing, stated that he would invoke his Fifth Amendment right not to testify regarding three unrelated shootings about which defense counsel wished to cross-examine him. The court agreed with defense counsel that, if Adams invoked the Fifth Amendment, counsel could not effectively cross-examine him. Therefore, at the request of defense counsel, the court ruled that Adams was unavailable to testify. *Hill*, A117787 at 45. At the time the prosecutor made his opening statement, he could not have known of the events that would eventually lead to the court ruling that Adams was unavailable as a witness.

Furthermore, as discussed above, the jury was instructed that opening statements were

not evidence and, thus, the prosecutor's remarks about Adams in his opening statement would not be considered by the jury in its deliberations. *See Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987) (jury is presumed to follow an instruction to disregard inadmissible evidence inadvertently presented to it). Therefore, even if the prosecutor's remarks about Adams could be construed to be misconduct, it did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht*, 507 U.S. at 637.

Accordingly, this claim is denied.

**C. <u>Cross-examination of Fraser</u>**

Petitioner asserts that the prosecutor, during his cross-examination of defense expert witness Scott Fraser, improperly suggested that Fraser had been fired from a tenured position at the University of Southern California (USC).

The state appellate court analyzed this claim as follows.

> Fraser, a neurophysiologist, testified as an expert on the effects of high stress on human functioning. On direct examination, Fraser stated that for more than 35 years, he had taught at the medical school and psychology departments at the University of Washington, Stanford University, and USC, and currently taught at the University of California, Los Angeles (UCLA), and the medical school at USC.
>
> Appellant points to the following colloquy during the prosecutor's cross-examination of Fraser:
>
> Prosecutor: You mention you teach at some universities. Are you a tenured professor at the University of Washington?
>
> Fraser: No.
>
> Prosecutor: Are you a tenured professor at [USC]?
>
> Fraser: I'm currently not. I was a tenured professor but I'm not anymore.
>
> Prosecutor: When you left USC, that was against your will; is that correct?
>
> Fraser: Absolutely false. I resigned.
>
> Prosecutor: You resigned from being a tenured professor at USC?
>
> Fraser: Correct. I accepted a position as CEO, I had a number of medical health problems. I needed a different career path.
>
> Prosecutor: Are you a tenured professor at UCLA?
>
> Fraser: No, I'm not a tenured professor anywhere.
>
> Defense counsel objected that there was "no good faith basis" for the prosecutor's

> allegation that Fraser resigned from USC against his will and the question was a "stab in the dark." Defense counsel requested that the court admonish the jury. The court ruled that the prosecutor's questioning was not done in bad faith, denied the request that the jury be admonished, and noted the jury would be generally instructed that the questions of counsel are not evidence.
>
> In reliance on *People v. Hill* (1998) 17 Cal. 4th 800, appellant argues the court "used the wrong standard by implying that the prosecutor's questioning would be misconduct only if it was done in bad faith." "'A prosecutor's conduct violates the Fourteenth Amendment to the Federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. . . . (Citation omitted). The trial court acted within its discretion in concluding that the prosecutor's questions regarding Fraser's reasons for leaving USC did not render the trial fundamentally unfair and were not "deceptive or reprehensible"; no prosecutorial misconduct is demonstrated. Moreover, the court did not abuse its discretion when it rejected defense counsel's request for an admonition and concluded that other instructions would ameliorate any harm from the prosecutor's questioning of Fraser.

*Hill*, A117787 at 48-49.

Petitioner again argues that, under *Hill*, the trial court wrongly applied the good faith standard in concluding that the prosecutor did not commit misconduct in questioning Fraser. Although, in California, *Hill* ended the requirement for bad faith on the part of the prosecutor for a finding that the prosecutor committed misconduct, Petitioner overlooks the applicable federal standard for prosecutorial misconduct which requires a finding that the prosecutor's alleged improper remarks or questions infected the trial with unfairness. *See Darden*, 477 U.S. at 181; *Tan*, 413 F.3d at 1112.

The prosecutor's question to Fraser about whether Fraser left his tenured position of his own accord followed from Fraser's answers that indicated he was a tenured professor, but he was not at the present. As the trial court stated, "In this situation where [Fraser] had indicated that he was a tenured professor but was not anymore, I don't think this question is misconduct of any kind . . ." RT at 9745. This question, which was fairly directed at Fraser's qualifications as an expert, did not infect the trial with unfairness. Furthermore, none of the factors warranting a finding of prosecutorial misconduct are present: this question was an isolated instance and not a pattern that occurred throughout the trial; the question did not relate to a critical part of the case; and the prosecutor did not manipulate or misstate the evidence.

Therefore, the state Court of Appeal's denial of this claim was not contrary to or an

United States District Court
For the Northern District of California

unreasonable application of established federal authority or an unreasonable finding of the facts in light of the state record.

**D. Griffin Error**

**1. Background**

The California Court of Appeal stated the facts regarding this claim as follows.

> Noting that he did not testify at trial, appellant argues the following cross-examination of Fraser constituted *Griffin* error:
>
> Prosecutor: And here today, . . . you're not representing yourself as an expert on gang culture, gang habits in any way, sir?
>
> Fraser: Certainly not.
>
> Prosecutor: Which means you can't tell us about [appellant]'s knowledge of unmarked police cars, whether he's a gang member or not, you can't tell us about his knowledge of unmarked police cars, can you sir?
>
> Fraser: I can tell you nothing about [appellant]'s history and knowledge base. I made no assessment of that.
>
> Prosecutor: Based on that last answer, you can't tell us about [appellant]'s experience with police officers in the Bayview?
>
> Fraser: No, that's correct.
>
> Prosecutor: You can't tell us about his attitude towards the police based on his experience in the Bayview?
>
> Fraser: That's also correct.
>
> Prosecutor: You can't tell us how [appellant] reacted when he saw a Crown Victoria in the area of Newhall . . . that night?
>
> The court then overruled defense counsel's objection that the prosecutor was "commenting on [appellant's] sitting here in trial and not testifying." Thereafter, the following colloquy ensued:
>
> Fraser: I don't know anything about that . . .
>
> Prosecutor: Now, . . . please assume [appellant] is a gang member and assume that he's in possession of an assault rifle, and assume that he sees police officers approaching, and he recognizes them as police officers at 9:30 at night on the 1300 block of Newhall. As I understood some of the things you told us earlier, that set of circumstances could set off some kind of threat reaction in [appellant]; is that right?
>
> Fraser: It could.
>
> Prosecutor: And [appellant] could perceive a threat not to his life, but one of the other kinds of threats that you mentioned a few minutes ago, a threat of being arrested, could have perceived a threat that he would be arrested?

United States District Court
For the Northern District of California

> Fraser: Certainly.
>
> Prosecutor: But you can't tell us what kind of threat, if any, [appellant] perceived that night on Newhall, can you, sir?
>
> Fraser: That's correct, I cannot, both legally and ethically, that's correct. I mean I as an individual could make a judgment if I were a trier of fact, obviously, but that's not my role and I can't do that from the witness box, and I won't. That's for the jury to decide.
>
> Appellant argued that the prosecutor's questions were designed to highlight appellant's decision not to testify at trial and therefore constituted *Griffin* error. The court disagreed and rejected the claim of *Griffin* error.

*Hill*, A117787 at 50-51.

**2. Federal Law**

Where a prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence or to treat the defendant's silence as substantive evidence of guilt, the defendant's privilege against compulsory self-incrimination is violated. *Griffin*, 380 U.S. at 615. While it is proper for the prosecution to address the defendant's arguments, a comment is impermissible if it is manifestly intended to call attention to the defendant's failure to testify or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify. *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) (citing *United States v. Bagley*, 772 F.2d 482, 494 (9th Cir. 1985)).

A prosecutor's comments calling attention to a defendant's failure to testify require reversal only if: "(1) the commentary is extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for the conviction; and (3) where there is evidence that could have supported acquittal." *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993). An improper comment warrants reversal only if it appears that it might have affected the verdict. *Untied States v. Pruitt*, 719 F.2d 975, 978 (9th Cir. 1983).

**3. Analysis**

The California Court of Appeal denied this claim, reasoning as follows.

> On direct examination, Fraser testified hypothetically about how persons act when they are under the influence of marijuana and in high stress situations. The questions posed by the prosecutor on cross-examination served to highlight the differences between this testimony and the testimony of certain prosecution witnesses who were able to opine on appellant's membership in a gang, gang members' knowledge of police practices and the relationship between gang members and the police. The

> question also highlighted that Fraser's testimony about the reactions of people under stress was not inconsistent with the prosecution's theory that appellant responded to the threat of arrest in shooting Espinoza. The prosecutor's cross-examination questions were proper and did not constitute comments on appellant's not testifying at trial. No *Griffin* error is demonstrated.

*Hill*, A117787 at 51-52.

Petitioner argues that the appellate court unreasonably applied *Griffin* because the court gave "no explanation as to who questioned Petitioner about his attitude towards the police and Petitioner's reaction when he saw an unmarked police car, and Petitioner's reaction to seeing police officers when he had an assault weapon." Petition at 10. Petitioner mischaracterizes the state appellate court's explanation. The court did not imply that other witnesses had interviewed Petitioner. The court reasoned that the prosecutor's questions highlighted the fact that prosecution gang expert Chaplin was able to provide testimony about the relationship between gang members, such as Petitioner, and the police, whereas Fraser was not qualified to do so. Furthermore, the prosecutor's hypothetical question was not improper because it was directed at Fraser's area of expertise, which was how persons react in high stress situations. Moreover, none of the factors stated in *Jeffries* is present: the prosecutor's commentary was not extensive, no inference of guilt based upon Petitioner's silence was made, and this evidence could not have supported acquittal. The prosecutor's questions were well within the rubric of proper cross-examination.

In summary, the Court of Appeal's denial of Petitioner's prosecutorial misconduct claims was not contrary to or an unreasonable application of established federal authority or an unreasonable determination of the facts in light of the state court record.

## VI. Sixth Ground: Improper Rebuttal Evidence

Petitioner claims that the trial court violated his due process rights to a fair trial by permitting the prosecution to present improper rebuttal evidence. Amendment to Petition (Docket no. 4) at 2-3.[8] Petitioner argues that the rebuttal evidence, including "gory

[8]In the Court's Order to Show Cause, it dismissed this claim because Petitioner had not stated any facts or argument in support of it. The Court allowed Petitioner to file an amendment to the petition remedying this deficiency. Petitioner timely filed the amendment to his petition. Docket no. 4.



United States District Court
For the Northern District of California

photographs of a double murder unrelated to Petitioner" was irrelevant and inflammatory and, thus, violated his due process rights.

The state appellate court recounted the facts regarding this claim as follows.

**A. The Murders of Junious and Baker**

In the prosecution's case-in-chief, Chaplin testified that the Bayview double murder of Junious and Baker was gang related. In the defense case, during cross-examination of journalist and Bayview resident Jones, the prosecutor elicited that Jones had written about the Junious and Baker murders. According to Jones, Baker was accused of being affiliated with Big Block and Junious [but] was neither accused nor affiliated with any gang. Jones said that while some people he spoke with described the double murder as gang related, he would not.

Thereafter, the prosecutor sought to rebut Jones's testimony with proof that the Junious/Baker murders were gang related through testimony by Chaplin and three photographs. Defense counsel objected, but the court ruled that the prosecutor's proffered rebuttal testimony was "appropriate."

Chaplin then viewed the three photographs and testified that Baker was a member of Big Block at the time he was murdered, and the bandana on the ground near Baker at the scene of the Junious/Baker murders supported Chaplin's opinion that Baker's killing was gang related.

. . .

Appellant argues that the Junious/Baker rebuttal evidence was improper because Jones acknowledged on direct examination that "some" people would describe the Junious/Baker murders as gang related. Further, appellant argues the rebuttal evidence was cumulative to testimony by Chaplin and San Francisco Police Sergeant Lucio Perez, submitted by the prosecution during its case-in-chief, that the Junious/Baker murders were gang related.

Since Jones testified on cross-examination that in his opinion the Junious/Baker double murder was not gang related, the prosecutor was entitled to rebut that testimony with gang-expert testimony by Chaplin and supporting photographs. While it is true Chaplin testified on direct examination in the prosecution's case-in-chief that the Junious/Baker double murder was gang related, his rebuttal testimony and the three photographs did not unduly magnify the importance of the evidence. We conclude there was no abuse of discretion.

**B. Chaplin's Testimony Regarding Telfor**

Telfor testified for the defense about his observations minutes before the shootings on April 10, 2004, particularly regarding appellant's purchasing marijuana at Newhall and Newcomb. On cross-examination, Telfor said that in early 2004 he spent a fair amount of time at Newhall and Newcomb selling drugs. He denied being a member of or affiliated with a gang in early 2004. However, he conceded he had a "1700 Block" tattoo on his chest. Telfor said that 1700 Block did not consider itself a gang. Telfor said 1700 Block was predominately African-American men, but it did have one Latino member, Telfor's friend "Chris."

The prosecutor sought to rebut Telfor's testimony that 1700 Block had a Latino member and to establish that a tattoo is evidence of gang membership. Defense



United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

> counsel objected that the proffered rebuttal by Chaplin was a repetition of testimony elicited during the prosecution's case-in-chief, and it was improper to permit the prosecution to rebut evidence elicited by the prosecution on cross-examination. The court overruled the objection. Thereafter, Chaplin testified he was unaware of any Latino male who, in early 2004, was an active participant in 1700 Block. Chaplin also testified that a tattoo that says "1700 Block" would be evidence of a person's participation in that gang.
>
> Appellant contends that because Telfor did not testify on direct examination as to 1700 Block or its members, this rebuttal evidence was improperly admitted. Because appellant provides no reasoned argument supported by pertinent authorities for the contention that the prosecution may not rebut evidence provided by a defense witness on cross-examination, we treat that argument as waived. Appellant further contends that neither Telfor's tattoo and supposed gang affiliation based on that tattoo nor his knowledge of the ethnic makeup of 1700 Block was relevant to his direct examination testimony that he saw appellant buying drugs on Newhall and Newcomb on the night of April 10, 2004. The People rejoin that the rebuttal evidence regarding Telfor's gang membership was properly admitted to undermine his credibility and thereby impeach his testimony on direct examination that appellant was at Newcomb and Newhall to purchase marijuana rather than to carry out a shooting of a rival gang member. We agree and conclude no abuse of discretion is demonstrated.

*Hill*, A117787 at 52-54.

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Holley*, 568 F.3d at 1101 (citing *Estelle*, 502 U.S. at 67-68). Generally, the admission of evidence relevant to an issue in the case does not violate due process. *Estelle*, 502 U.S. at 70. And, as stated above, the Supreme Court has not clearly ruled that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation. *Holley*, 568 F.3d at 1101.

The state appellate court analyzed this claim under the state rules of evidence. Under the established federal authority cited above, the state court's decision was reasonable. The evidence was relevant to the credibility of defense witnesses Jones and Telfor. Chaplin's testimony tended to undermine defense witness Jones's assertion that the Junious/Baker murders were not gang related and undermined the credibility of Telfor who testified for the defense that, on the night of Espinoza's murder, Petitioner was at Newcomb and Newhall to purchase marijuana.

Although the rebuttal evidence may have been prejudicial, it was relevant and did not render the trial fundamentally unfair. The state court's denial of this claim was not contrary to or an unreasonable application of established federal authority. Accordingly, habeas relief

on this claim is denied.

**VII. Seventh Ground: Juror Misconduct**

Petitioner contends that several jurors committed misconduct by speaking to the jury foreperson about Juror Number (JN) 8 falling asleep during the trial and that the trial court violated his Sixth and Fourteenth Amendment rights to a fair trial by failing to conduct an evidentiary hearing regarding this alleged misconduct.

The state appellate court addressed this claim as follows.

> On December 13, 2006, the jury began its deliberations. On December 19, the fourth day of deliberations, after the jurors had posed numerous questions to the court and made various requests for the readback of testimony, Juror No. (JN) 9 asked to speak to the court regarding another juror's misconduct during the trial. At an in camera hearing, JN 9 said that on multiple occasions during the trial she observed JN 8, whom she sat next to, "falling asleep" and had to nudge her to stay awake and focused. She said other jurors observed this too. On several occasions JN 8 said to JN 9, "You need to help keep me awake." JN 9 said she had a "huge concern" about JN 8's ability to listen to all the evidence and make an informed decision. JN 9 denied having any "open conversations" with other jurors about this issue, but said she and other jurors would look at JN 8 and then at each other. JN 9 apologized for not bringing the issue up sooner and was "terrified" she might be responsible for a mistrial for failing to do so sooner. JN 9 said she was certain she could continue deliberating in good faith.
>
> Next, the court questioned JN 8, who admitted there were times during the trial that she would fall asleep briefly, but did not think she missed any part of the trial. She admitted "maybe in joking" that she asked others to help her stay awake. She also admitted that for about a week during trial she was ill and was prescribed medication containing codeine, which made her drowsy. JN 8 said that for the last two days it had been "11 versus 1 against me here." She also said, "[A]nd I've had to hear my foreman today say, Okay, we've spent all day on this. And they told him: Don't talk to her like that. So I'm just saying for someone to say that – there's a few people that have strong opinions, and I just think this is a lot of – there's nothing wrong with me and my ability whatever."
>
> The court next questioned jury foreperson, JN 10. JN 10, who sat two seats away from JN 8, said that JN 8 "missed a fair portion of the trial," and it had become evident during deliberations that JN 8 was "missing a lot of things that were said in the trial, [and] doesn't understand some of the stuff that went on." When asked if this was because JN 8 did not hear or see evidence at trial, or because she had a "different understanding and memory" and a "different approach to the evidence," JN 10 responded, "I think [JN 8] has a different approach to it." However, JN 10 said, "the big problem is [JN 8] missed stuff that went on in the trial." JN 10 said he saw JN 8 asleep for at least a minute on three or four occasions. Three or four times JN 10 saw the juror next to him touch JN 8 to awaken her. JN 10 also said on one occasion he heard JN 4 snoring. JN 10 said that during deliberations JN 8 had fallen asleep twice.
>
> The court next questioned JN 1, who said that during the trial she saw one or two people from time to time with their eyes closed but did not see anyone "totally asleep." She did not see anyone shaken awake or hear anyone snoring, and during deliberations had not seen anyone fall asleep. After JN 1 was released for lunch, defense counsel objected to "this whole process," and particularly, the court's follow-

up questions to JN 1 after she indicated she did not think there was a problem. Defense counsel argued the court was "directing jurors towards a particular result," and devaluing JN 8's "voice in this jury." The court noted the objections and continued with its questioning of the jurors.

The court next questioned JN 2, who said she felt that one or two jurors, "but mainly" JN 8, were falling asleep during the trial, "particularly when the prosecutor was up." JN 2 said that once or twice during trial she saw JN 8 with her eyes closed or appearing to sleep. JN 8 asked JN 2 to tap her if she saw JN 8 nodding off and told JN 2 that she (JN 8) had nodded off a few times. JN 2 never heard JN 8 snore and never woke her up. JN 2 said that about four times during deliberations she had seen JN 8 dozing or sleeping for about a minute. JN 2 said that during the trial, six or seven other jurors had discussed JN 8's sleeping. Defense counsel then argued that by focusing on a single juror the situation appeared to be "extremely coercive" and he objected to any further questioning. The court again noted the objection and continued its juror questioning.

Next, the court questioned JN 3, who opined that all the jurors received all the evidence necessary to enable them to carry out their duties as jurors. She said she saw JN 4 and JN 9 nodding off, but not sleeping, on a "couple of days." Twice, for less than a minute, JN 3 heard snoring. JN 3 was unaware of any juror sleeping during deliberations.

Next, the court questioned JN 4, who said he thought all 12 jurors received all the evidence in the case necessary for them to carry out their duties as jurors. He said "a few of us were probably blinking out at different points" during the trial for less than a couple of seconds at a time. JN 4 said he was only aware of jurors nodding off or sleeping during breaks, not during deliberations.

Next, the court questioned JN 5, who said everyone was paying attention during the trial. JN 5 said he was unaware of anyone nodding off or sleeping during deliberations, but opined that at times jurors were "getting bored." He never heard anyone snoring.

The court next questioned JN 6, who stated that all 12 jurors were aware and conscious of all the evidence in the trial and carried that awareness into the deliberation process. He did not know of anyone nodding off or sleeping during the case or during deliberations and had not heard snoring. Defense counsel again argued there appeared to be a division in the jury, with some members hostile to JN 8 and wanting her off the jury.

Next the court questioned JN 7, who opined that all the jurors received all of the evidence at trial necessary for them to carry out their duties. She was unaware of anyone snoring, nodding off or appearing to sleep at any time during trial or deliberations.

Next, JN 11 said that on at least three or four occasions during trial, JN 8 was unable to stay awake for about a minute at a time. JN 11 said JN 8 "remembered particular evidence in a telescoped way, indicating that the juror may have missed an hour or so of testimony." JN 11 also observed JN 7 and JN 9 nudging JN 8. Once JN 11 heard JN 4 snoring and once she heard JN 8 snoring. Once during deliberations, JN 11 saw JN 8 nodding off.

Next, JN 12 opined that all 12 jurors had received all the evidence at trial. JN 12 was unaware of any juror nodding off, sleeping or snoring during trial. On one occasion during deliberations, JN 12 saw that JN 8's eyes were closed.

United States District Court
For the Northern District of California

The court noted the "split" in the jurors and that there appeared to be strong feelings among some of them, but denied the prosecution's request to remove JN 8 because it was not persuaded that she was incapable of carrying out her responsibilities as a juror. The court said it would order the jurors to continue their deliberations.

Thereafter, defense counsel moved for a mistrial due to the "interruption and interference in the deliberative process" in violation of appellant's right to due process. Defense counsel also requested an inquiry into whether JN 8 had been affected by the juror questioning, which "single[e]d out and focus[ed] on her" as an inattentive juror, and whether the other jurors had discussed JN 8 during breaks, in violation of the court's admonition. Defense counsel argued that since no prejudice to either party was demonstrated there was no basis for removing JN 8, and removing JN 8 would be an "extremely invasive act" amounting to structural error.

The court again ruled there had not been a showing of a "demonstrable reality" that JN 8 was unable to perform her functions as a juror, so the court declined to discharge her. The court rejected as "dangerous and unnecessary," defense counsel's request to inquire of all the jurors as to JN 8's ability to have her voice heard. The court also denied defense counsel's request for an inquiry into jury admonition violations and for a further instruction. Finally, the court denied the motion for mistrial, stating it did not find that the jury deliberation process had been "so infected or tainted" as to warrant a mistrial.

On appeal, appellant contends solely that the court erred in failing to inquire into whether up to seven jurors committed misconduct by discussing JN 8 outside the presence of the entire jury in violation of appellant's Sixth and Fourteenth Amendment rights.

. . .

In denying appellant's request for an evidentiary hearing, the court stated, "I do not find that it is necessary to bring out and inquire further about what counsel has described as misconduct by three of the jurors in speaking to the foreperson. I don't find from what the foreperson described that they violated an admonition to have raised the issue that they raised. They did not violate an admonition about talking about the case and the avenues that they pursued are entirely reasonable avenues for a jury. That is why you have a foreperson, to help organize their deliberations. That can be someone with whom they raised concerns, not about the case, but about other things they may observe. So I don't find that it's necessary or appropriate to conduct any further inquiry into that conduct.

Appellant argues that during the in camera hearing, two jurors, including the foreperson, admitted they discussed JN 8 outside of deliberations with less than the entire jury present, and that such discussion constitute misconduct and violated the court's admonition. Appellant asserts there is "ample evidence" that the accusation against JN 8 arose "*after* it became apparent that she was a holdout." As support, he notes that no complaints about JN 8 were made during the first three days of deliberations. He also asserts that the contradictions in the testimony of the jurors other than JN 8 "indicate that the complaints made against JN 8 had a subtext, i.e., her holdout status."

Appellant's argument is premised on JN 8's status as a "holdout." The only evidence in the record supporting this premise is JN 8's comment that for the last two days of deliberation it has been "11 versus 1 against me here." This comment does not establish an 11 to 1 split among the jurors on the *merits* of the case, as distinct from an identical numerical split regarding whether JN 8 was inattentive. The comments from

United States District Court
For the Northern District of California

> each of the other jurors focused on JN 8's attentiveness or lack thereof during the trial and the deliberations. None of the jurors stated that they had discussed JN 8's view of the case or that they were hostile to it. Jury foreperson, JN 10, said that in the last day three different jurors had approached him and commented on JN 8's inattentiveness during trial. Nothing in JN 10's statement suggests that the three jurors, or any other jurors, commented on JN 8's status as a holdout, and there certainly was no factual dispute that such conversations had occurred. The trial court could properly conclude that there was no misconduct in the three jurors telling the foreperson that JN 8 appeared to be sleeping during trial. Thus, the court properly exercised its discretion in refusing to hold an evidentiary hearing into the statements of the three jurors to JN 10.

*Hill*, A117787 at 55-61 (emphasis in original).

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "Even if 'only one juror is unduly biased or prejudiced,' the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (quoting *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

However, clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties. *Tracey v. Palmateer*, 341 F.3d 1037, 1045 (9th Cir. 2003) (citing *Remmer v. United States*, 347 U.S. 227 (1954) and *Smith v. Phillips*, 455 U.S. 209, 217-18 (1982) (finding no error where trial court, during questioning of one juror about potential misconduct, declined to inquire about other jurors who were potentially subject to misconduct); *Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (trial court need not order a hearing sua sponte whenever presented with evidence of juror bias). *Remmer* and *Smith*, read in combination, provide a flexible rule that a federal court, confronted with a claim of jury misconduct or bias, should "'consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source' when determining whether a hearing is required." *Id.* at 1155.

In his habeas petition, Petitioner appears to concede his claim of juror misconduct based on the fact that, during the trial, six or seven jurors discussed JN 8's tendency to fall asleep during the trial. Here, Petitioner focuses on the fact that the record supports the finding that, during deliberations, the jurors were discussing JN 8 because she was a holdout

and that the state appellate court's finding to the contrary was unreasonable. Petitioner points to the record which shows that JN 8 said that during the last two days of deliberations it was "11 versus 1" against her and that it was "getting hostile" in the jury room. *See* RT 10571-73. Petitioner argues that the appellate court's theory that the eleven to one split could have referred to the jurors addressing JN 8's inattentiveness rather than her being a holdout was wrong because, when the court questioned the jurors, only six jurors commented on JN 8's inattentiveness.

Even assuming Petitioner's view is correct and that JN 8's comments referred to the fact that she had a different opinion than the rest of the jurors, the appellate court's denial of the claim based on the trial court's decision not to hold a further evidentiary hearing focusing on three jurors' comments to the jury foreperson was not contrary to or an unreasonable application of established Supreme Court authority. As noted by the appellate court, the fact that three jurors spoke to the foreperson about JN 8 sleeping during the trial did not constitute juror misconduct because the jurors did not speak about the case or the jury deliberations process, but a concern about their observations of another juror.

The record of the hearing on defense counsel's motion for a hearing regarding the three jurors indicates that the trial court carefully considered the issues of possible juror misconduct and balanced that with the danger of unwarranted judicial interference with the jury's deliberation process. The trial court stated that, in its questioning of the jurors after it received notice that some jurors were concerned about JN 8's sleeping during the trial, it had not questioned the jurors specifically about JN 8, but "was questioning them about whether they had seen evidence as to any jurors. So I was not focusing their attention on [JN 8]. And the fact that after speaking to all 12 jurors the Court then ordered the jury to start deliberating again, to the extent that [JN 8] may have felt concerned or uneasy about why she was out here, clearly the result at the end of speaking with 12 jurors was that the Court ordered the jury to go back into the jury room and deliberate. So it would seem that that very act by the Court would not have contributed to her sense of unease, but in fact they were ordered to start their deliberations anew. . . . I don't think it is appropriate to bring all the other jurors

United States District Court
For the Northern District of California

out and focus their attention on [JN 8] by inquiring from them if they feel she has in some way been devalued. I think that treads all over the deliberation process." RT at 10643-44.

This record shows that the trial court acted exactly as federal authority requires. It considered the content of the allegations and the seriousness of the alleged misconduct or bias, and then determined that the evidentiary hearing sought by defense counsel was not necessary and, in fact, would inappropriately be intruding into the jury deliberation process. Therefore, the appellate court's affirming the trial court's decision to deny an evidentiary hearing was not contrary to or an unreasonable application of established federal authority.

## VIII. Eighth Ground: Motion for New Trial after Verdict

### A. Juror Misconduct Claim Presented on Direct Review

Petitioner argues that evidence came to light after the jury had reached its verdict which shows that juror misconduct took place during the jury's deliberations. He contends that his Sixth and Fourteenth Amendment rights to a fair trial by an impartial jury were violated when the trial court denied defense counsel's motion for a new trial based upon this juror misconduct.

The state Court of Appeal addressed this claim as follows:

> The jury reached its verdicts on January 4, 2007. At the commencement of the April 20, 2007 sentencing hearing, the court noted that appellant had filed, under seal, a motion for new trial based on juror misconduct. The thrust of the alleged juror misconduct claim was the jurors impermissibly considered the consequences of a mistrial in the event of a hung jury and impermissibly considered punishment in reaching their decision in an attempt to ensure that appellant would be sentenced to life in prison without the possibility of parole. The motion was supported with affidavits by another defense counsel, James Conger, and by defense investigator Barry Simon. Defense counsel stated that jurors had been reluctant to talk to him because of the publicity the case had received. Defense counsel requested that the court continue the sentencing hearing and hold an evidentiary hearing to determine the nature and extent of the alleged juror misconduct. Defense counsel said that his discussion with JN 8 and JN 4 were reflected in the affidavits from Conger and Simon. In particular, he said JN 8 had unequivocally stated that the guilty verdict on the second degree murder charge and the affirmative finding on the special circumstance did not reflect her point of view and it was not her true and correct verdict.
>
> The prosecutor responded that the affidavits merely described the deliberative process and did not establish that the alleged juror discussion "drove votes" by the jurors. The prosecutor argued against continuing the sentencing hearing.
>
> In denying the motion for new trial, the court noted that the motion was not supported by affidavits from jurors describing the alleged misconduct. The court concluded the

> affidavits submitted were not sufficient to establish a presumption of juror misconduct and shift the burden to the prosecutor, or to require an evidentiary hearing. The court noted that there had already been a lengthy period between the jury's verdicts and sentencing to allow the defense to bring a new trial motion. Defense counsel responded that it was not necessary to support his motion based on juror misconduct with juror affidavits and said, "I can have JN 8 here today." The court noted the objection and reiterated its denial of the new trial motion.
>
> . . .
>
> Here, as in *People v. Cox*, (1991) 53 Cal. 3d 618, the only evidence offered to support appellant's claim of juror misconduct consisted of hearsay declarations of a defense counsel and the defense investigator. None of the jurors provided sworn statements. Appellant argues that *Cox* is distinguishable. He asserts "this is not the 'normal' case in which hearsay is insufficient to trigger the hearing requirement" because JN 8 "had already complained under oath about the other jurors—there was no suggestion that JN 8 was unwilling to verify her claim." The assertion lacks merit. Although JN 8 was sworn as a juror following jury selection, her complaints about the other jurors were not made under oath. Although defense counsel argued at the new trial hearing that he could "have JN 8 here today," the court could properly reject the assertion as speculative. Based on the hearsay declarations filed under seal in support of the new trial motion, and the fact that in the three months between the jury's verdict and the new trial hearing the defense was unable to obtain the sworn statement of any juror, the court acted within its discretion in concluding that the defense's hearsay evidence failed to demonstrate a "strong possibility of prejudicial misconduct," and in denying the new trial motion without an evidentiary hearing.

*Hill*, A117787 at 61-63.

Alleged errors in the state post-conviction review process are not cognizable on federal habeas corpus. *Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Villafuerte v. Stewart*, 111 F.3d 616, 632 n.7 (9th Cir. 1997). The denial of a motion for new trial does not ordinarily implicate constitutional issues. *Townsend v. Sain*, 372 U.S. 293, 317 (1963) *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992); *see also United States ex. rel. Guillen v. DeRobertis*, 580 F. Supp. 1551, 1555 (N.D. Ill. 1984). The standard for determining whether or not a motion for a new trial will be granted is a matter of state law and unless there is a denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved. *See United States ex rel. Harris v. Illinois*, 457 F.2d 191, 198 (7th Cir. 1972); *see also Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

This claim must be denied because Petitioner has not shown a new trial was necessary to rectify the denial of a specific constitutional right. Although the state court denied this claim under state law, the claim also must be denied because, under federal law, courts may

United States District Court
For the Northern District of California

not consider the subjective impact of extrinsic evidence on the deliberation process. *Estrada v. Scribner*, 512 F.3d 1227, 1237 (9th Cir. 2008) (affirming district court's determination that it could not consider portions of jurors' affidavits proffered by petitioner pursuant to Fed. R. Evid. 606(b) because they addressed the subjective effect of evidence on particular jurors, but finding that district court could consider juror testimony about extrinsic evidence improperly brought to jury's attention); *Sassounian v. Roe*, 230 F.3d 1097, 1108-09 (9th Cir. 2000); *Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir. 1997) *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 829 n.11 (9th Cir. 2002).

The long-established rule is that jurors may not impeach their own verdicts, except where an extraneous influence affected the verdict. *McDonald v. Pless*, 238 U.S. 264 (1915); *Tanner v. United States*, 483 U.S. 107, 117 (1987); *United States v. Weiner*, 578 F.2d 757, 764 (9th Cir. 1978). This rule, with narrow exceptions, is codified in Federal Rule of Evidence 606(b). *Id.*

Federal Rule of Evidence 606(b) provides:

(1) Prohibited Testimony or Other Evidence

During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions. A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b).[9] Rule 606(b) is applied in habeas corpus proceedings. *Sassounian*, 230 F.3d at 1108.

The rationale for this rule is the protection of jury verdicts which "can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could

[9]California Evidence Code § 1150(a) is substantively similar to Federal Rule of Evidence 606(b). *Estrada*, 512 F.3d at 1237 n.10.

be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *Tanner*, 483 U.S. at 119-20 (citations omitted).

In applying this rule, juror testimony about the consideration of extrinsic evidence, which courts may consider, must be distinguished from juror testimony about the subjective effect of evidence on any of the particular jurors, which courts may not consider. *Estrada*, 512 F.3d at 1237. In *Estrada*, the court held that the affidavits of two jurors who stated that they felt pressured to vote for second-degree murder and were treated disrespectfully by other jurors were inadmissible because they recounted their subjective mental processes. *Id.* However, the Ninth Circuit has held that a juror's discussion of penalties constitutes error that could potentially be of constitutional dimension. *Zhuk v. McDonald*, 2011 WL 3925090, *10 (E.D. Cal.) (citing *Bayramoglu v. Estelle*, 806 F.2d 880, 887-88 (9th Cir. 1986)).

JN 8's statement to defense counsel that her guilty verdict on the second degree murder charge and affirmative finding on the special circumstances allegation were not her true verdicts is similar to what the jurors stated in *Estrada*, which the court rejected as representing their subjective mental processes. Thus, JN 8's statements regarding her verdicts could not be considered by the court.

However, a juror's speculation about sentencing can be improper. In *Zhuk*, the court discussed several Ninth Circuit cases which found error where the jury had done so. In *Bayramoglu*, 806 F.2d at 887-88, the court stated that, unless properly mitigated, discussion of possible sentences is impermissible extrinsic evidence, and in *Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir. 2002), the court stated that juror discussion of the possibility of parole for the defendant introduced impermissible extrinsic evidence and raised a risk of constitutional defect. In *Grotemeyer v. Hickman*, 393 F. 3d 871, 880 (9th Cir. 2004), the court held that the jury's improper discussion of sentencing was mitigated by the court's instruction not to discuss or consider the subject of penalty or punishment and denied the jury misconduct claim on this basis. In *United States v. Straach*, 987 F.2d 232, 242 (5th Cir. 1993), the Fifth

Circuit denied a jury misconduct claim because, although the jury discussed penalties, the evidence did not suggest it learned about the penalties from outside sources.

In *Zhuk*, the court noted that the jury was instructed not to consider punishment in its deliberations and the court presumed that the jury followed this instruction, despite any improper discussions during deliberations. 2011 WL 3925090, at *11. Thus, the court found no prejudice could have resulted. *Id.* It denied the claim on this basis and on the fact that the Supreme Court had not established precedent clearly establishing a constitutional right prohibiting a jury, in a non-capital criminal proceeding, from discussing punishment in its deliberations. *Id.*

Here, as in *Straach*, the record does not contain evidence that the jury's speculation about Petitioner's possible punishment came from outside sources. Also, as in *Zhuk*, the jury was instructed not to "consider or discuss penalty or punishment in any way when deciding whether a special circumstance, or any other charge, has been proved." CT 1699. Thus, even if the discussion of punishment could be considered to be based on extrinsic evidence, because juries are presumed to follow the instructions they are given, there is no probability that this discussion could have had a substantial or injurious effect on the jury verdict. Accordingly, the appellate court's denial of this claim was not contrary to or an unreasonable application of Supreme Court authority. This claim for habeas relief is denied.

**B. <u>Juror Misconduct Claim Presented on Habeas Review</u>**

Petitioner filed a petition for a writ of habeas corpus in the California Court of Appeal in which he alleged juror misconduct, supported by a declaration from JN 8. Petitioner argued that the declaration showed that the jury committed misconduct by disregarding the trial court's instruction not to consider the penalty and by refusing to deliberate on the issue of self-defense. The Court of Appeal denied the petition without comment. Exh. G. Petitioner sought review in the California Supreme Court, which also denied the petition without comment. Exh. K. Because there is no reasoned state court decision on this claim, the Court undertakes an independent review of the record to determine whether the state court's denial of this claim was an objectively unreasonable application of established federal

law.

The declaration from JN 8 states, in relevant part:

> I was Juror Number Eight in the murder trial of David Hill . . .
>
> During deliberations in this case, I expressed a desire to discuss whether defendant Hill had acted in self defense. Another Juror, who I believe had complained about me to the judge, stated that this would cause a mistrial which would entail a significant expenditure of time and money. The jurors discussed the possibility of a hung jury and several said that they would vote differently in order to come to a verdict rather than not agree on a verdict and create the need for a new trial.
>
> As for me, because some of the other jurors had complained about me and, as a result, [the] judge had questioned me about nodding off during the trial, I felt intimidated by the other jurors and ultimately cast my vote with them although guilty on murder was not my true vote.
>
> During deliberations the jury also discussed punishment. One or more of the jurors wanted to find the special circumstance alleged against the defendant true because that would mean he would be sentenced to life without the possibility of parole.
>
> I was willing to testify at the new trial motion on April 20, 2007 or on any date, and had I been called, I would have testified to the facts set out above.

Exh. A to Exh E at 1-2.

Submitting the declaration of JN 8 does not save the juror misconduct claim that Petitioner presented on direct appeal. As discussed above, the claim based on the jury's consideration of punishment fails because the record does not show that the jury's speculation about punishment came from outside sources and no Supreme Court precedent holds that the jury's consideration of punishment can violate the Constitution.

The claim that the jury failed to deliberate on the issue of self-defense is based on statements about the jury's internal deliberation process which, under Federal Rule of Evidence 606(b) and *Tanner*, cannot be considered by the Court. Likewise JN 8's statement that her guilty vote was not her true vote cannot be considered because it focused on her own internal mental process.

Therefore, this Court's independent review of the record determines that the state courts' rejection of this juror misconduct claim was not an objectively unreasonable application of clearly established federal law.

United States District Court
For the Northern District of California

**IX. Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. 28 U.S.C.. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists could find its assessment of the following constitutional claims debatable or wrong: (1) violation of due process and the Confrontation Clause based on the admission of Chaplin's out-of-court statements upon which he relied to support his opinions; (2) violation of due process based on the admission of eight gang-related offenses and fourteen gang shootings; and (3) violation of due process based on the admission of hearsay testimony from police officers. Petitioner has not made a substantial showing of the denial of a constitutional right on the other claims in his petition. Therefore, a certificate of appealability is granted, in part.

Petitioner may not appeal the denial of a certificate of appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

//

//

//

United States District Court
For the Northern District of California

**CONCLUSION**

For the foregoing reasons, the Court DENIES the Petition for Writ of Habeas Corpus as to all claims. A certificate of appealability is granted, in part. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: January 28, 2013

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE